| | |
|---|---|
| E.L.K., by and through his Parent and Natural Guardian, E.K.,<br><br>      Plaintiffs,<br><br>v.<br><br>Minneapolis Public Schools, Special School District No. 1,<br><br>      Defendant. | Civil File No. 14-cv-4273 (MJD/LIB)<br><br><br>**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND IN SUPPORT OF MOTION TO DENY PLAINTIFFS' PETITION FOR ATTORNEY FEES AND COSTS** |

## INTRODUCTION

Minneapolis Public Schools, Special School District No. 1 ("Minneapolis" or "the District"), submits this Memorandum of Law in Support of its Motion for Judgment on the Administrative Record and in Support of its Motion to Deny Plaintiff's Petition for Attorney Fees and Costs under the Individuals with Disabilities Education Act ("IDEA").[1]

This is a partial appeal of an Administrative Law Judge ("ALJ") decision under the IDEA. The ALJ correctly determined that the E.L.K. ("EK" or "Student") had been provided a free appropriate public education ("FAPE") and that the District's evaluation of EK was appropriate. Minneapolis does not appeal those parts of the decision. However, after determining that Minneapolis had conducted an appropriate evaluation and provided EK a free appropriate public education, the ALJ ordered Minneapolis to

---

[1] 20 U.S.C. §1401 *et seq.*

provide compensatory education.  The award of compensatory education was an error and Minneapolis appeals that part of the decision.

The Plaintiff does not appeal any part of the ALJ's decision.  Plaintiff instead brings an action for attorneys' fees associated with the administrative hearing.   Plaintiff's petition for attorney fees and costs should be denied.   Plaintiff was not the prevailing party at the administrative hearing.   The ALJ ruled in favor of the District on the two primary issues at hearing (evaluation and FAPE), and the ALJ's award of compensatory education must be reversed because it is not supported by the facts or law.

Our memorandum consists of a statement of procedural posture, summary of relevant facts, legal analysis and a conclusion.

## I.      PROCEDURAL POSTURE

On May 5, 2014, the Plaintiff ("Plaintiff" or "the Parent") requested a due process hearing under the Individuals with Disabilities Education Act and Minn. Stat. §125A.091 subd. 14, against Minneapolis alleging that the District had denied her son, EK, a free appropriate public education.  Plaintiff sought compensatory education, an independent educational evaluation, and a change in the location of EK's educational services.[2]

The ALJ set the following issues for hearing:

1.  Whether the School District provided Student a Free Appropriate Public Education (FAPE) since May 5, 2012.  In particular:

    a.  Was the October 2011 evaluation of Student sufficiently comprehensive to identify all of EK's special education and related services?

_____

[2] September 12, 2014 Findings of Fact, Conclusions of Law, and Order, p. 3, hereinafter "Decision at ____".

     b.  Was the use of "SAIL" data system criteria and measurements to set and measure IEP achievement goals and progress appropriate?

     c.  Was Student's IEP team required to include a qualified ASD teacher?

     d.  Was there a failure to communicate and cooperate with Student's mother and her advisors that denied Student's mother's right to participate in EK's education?

2. Whether Student's mother forfeited the right to an Independent Educational Evaluation (IEE)?

3. Whether the School District unilaterally changed Student's placement through a pattern of suspensions and exclusions that totaled more than ten school days in one school year. If so, did it cause Student a loss of educational benefit entitling him to compensatory education?

*Decision at 1-2, Statement of Issues.*

A hearing was conducted on four days in July 2014.[3] The Parent called seven witnesses and Minneapolis conducted direct examination of five witnesses.[4] The evidence at hearing established that EK made both academic and behavioral progress while a student in the District.[5] The ALJ ruled in favor of Minneapolis as to the issue of FAPE, concluding that Minneapolis had provided EK a free appropriate public education.[6] The ALJ also ruled in favor of Minneapolis on the issue of the sufficiency of the District's evaluation, concluding that Minneapolis conducted an appropriate evaluation of EK and Plaintiff was not entitled to an independent educational evaluation.[7]

---

[3] *Id.* at 3, Finding of Fact 8.
[4] *Id.* at 4, Finding of Fact 9.
[5] Decision at 7-8, Findings of Fact 22, 27, 28; at 12, Finding of Fact 44; at 17, Findings of Fact 59, 60.
[6] Decision at 7-8, Findings of Fact 22, 27, 28; at 12, Finding of Fact 44; at 17, Findings of Fact 59, 60.
[7] Decision at 7, Conclusion of Law 7.

The only issue on which the ALJ ruled in favor of the Parent was whether EK's 12 days of suspension in a school year caused him a loss of educational benefit. Completely contrary to his determination that the Student received a FAPE, the ALJ found that the Student suffered loss of educational benefit because he was suspended more than ten (10) days in one school year. As to this issue, the ALJ ruled in favor of the Parent and Minneapolis now appeals that ruling.

Minneapolis specifically appeals Conclusions Number 9 and 10. In Conclusion Number 9, the ALJ citing federal regulations determined that a unilateral change of placement occurred when the Student's suspensions totaled more than ten (10) days in one school year. The ALJ's statement of the law is incorrect and he failed to cite to any evidence to support that the Student sustained educational harm and had been denied a free appropriate public education. As compensatory education, Conclusion Number 10 required Minneapolis to retain Dr. Kristen Wiik for the 2014-2015 school year to assist the Individual Education Program ("IEP") team "in evaluating EK and designing and amending Student's IEP…". Again, this award is contrary to the finding that Minneapolis had properly evaluated the Student and no further evaluation was warranted. Minneapolis appeals the ALJ Decision on the grounds that the ALJ made factual and legal errors and exceeded his authority by ordering Minneapolis to retain Dr. Wiik when the ALJ had already determined that Minneapolis had provided EK a free appropriate public education.

## II.    SUMMARY OF RELEVANT FACTS[8]

EK is a child with a disability eligible for special education under the categories of Autism Spectrum Disorders ("ASD") and Emotional Behavioral Disorder ("EBD").  His Individual Education Program ("IEP") calls for him to be educated in a federal setting IV school- a separate, public day school.[9]   The relevant time period in this case is the two year period that began with the hearing request; from May 2, 2012 to May 2, 2014.[10] However, contextually it is important to review EK's educational history in some detail.

### A.    Pre-School and Elementary Special Education Services.

EK has received special education services since pre-school. He had challenging behaviors in his early school years including hitting teachers and other students and being oppositional.[11]

In the fall of 2005, when EK was a first grader attending the District's Bancroft Elementary School, he was evaluated by Hennepin County Medical Center and he did not meet the criteria for Attention Deficit Hyperactivity Disorder ("ADHD").[12]  His cognitive testing placed him at the extremely low to borderline range.[13]  He did not meet the criteria for pervasive development disorder ("PDD") at that time either.[14]  He was diagnosed with Oppositional Defiant Disorder ("ODD") and mild mental retardation.[15]

---

[8] The Relevant Facts are taken largely from the ALJ's Findings of Facts.
[9] Exhibit (hereinafter "Ex. __") 29; Ex. 265.
[10] See 20 U.S.C. § 1415 (f)(3)(c), 20 U.S.C. § 1415 (b)(6)(B).
[11] Ex.114, p.2; Ex. 226.
[12] Ex. 117, pp.3, 7; Ex. 204.
[13] *Id.* at p.7.
[14] *Id.*
[15] *Id.* at p.8.

EK was evaluated by Park Nicollet Clinic in April of 2008 and was found to meet criteria for PDD.[16] The District conducted a re-evaluation of EK's special education needs at that time at his mother's request.[17] She wanted to determine whether he met the educational criteria for Autism Spectrum Disorder. Initially, he did not but another evaluation was done in November of 2008 and he qualified for services under ASD.[18] As a result, the IEP team, including EK's mother, agreed that he should attend an ASD program at the District's Jefferson Elementary School.[19] EK began there in January of 2009.[20] EK remained there until the end of fifth grade prior to starting middle school. EK transitioned to middle school with his peers.

**B.    May 4, 2012 to end of 7th Grade.**

From May 2, 2012 to June 5, 2012, EK was in the seventh grade in a middle school SPAN classroom.[21] SPAN is a setting III special education program.[22] A SPAN classroom is a special education classroom in a general education building.[23] It is a program for students with significant emotional and behavioral needs.[24]

**C.    October, 2011 Evaluation.**

---

[16]Ex. 114, p.2. PDD is part of the Autism spectrum.

[17] Ex. 27, p.128.

[18] The educational criteria for ASD are found at Minn. R. 3525.1325.

[19] *Id.*

[20] *Id.*

[21] Ex. 1, Exs. 8, 9. The Plaintiff requested a due process hearing on May 2, 2014 and the relevant period of time in this hearing is May 2, 2012 to May 2, 2014.

[22] Hearing Transcript, p.573, ll.17-19 (hereinafter "T.__, l.__").

[23] *Id.* at 23.

[24] Ex. 27, p.123.

At the beginning of his seventh grade year, EK had a re-evaluation which was completed on October 14, 2011.[25]  The evaluation indicated that EK scored in the low to very low range compared to same age peers on academic achievement tests.

The evaluation also reported a history of problematic behaviors in school including refusing adult direction; bullying, teasing and hitting peers; hitting or shoving special education staff; and leaving his assigned area.[26]  A functional behavior assessment was conducted as part of the evaluation.[27]  As a result, EK had a behavior intervention plan aimed at decreasing his challenging behaviors and teaching him positive skills such as self-talk when a situation is challenging and learning how to respectfully disagree or make complaints.[28]

EK's progress reports at the end of the 2011-2012 school year show that he maintained appropriate speech about 75% of the time, he increased his ability to be in his seat or the right area in school from 82% to 97% of the time and he engaged in appropriate behavior about 91% of the time.[29]

D.     Eighth Grade (2012-2013 School Year).

EK attended the SPAN program at the District's Anderson School as an eighth grader during the 2012-2013 school year.  SPAN is a setting III special education program.[30]

---

[25] Ex. 114.
[26] *Id.* at p.6.
[27] *Id.* at pp.7-9.
[28] *Id.* at pp.7-9.
[29] Ex. 8, Ex. 9, Ex. 220.
[30] T.573, ll.17-19.

EK's IEP team met on October 10, 2012.[31] At that point in the school year EK continued to use inappropriate speech – sometimes threatening others or cussing and his time on task with learning was a concern because he struggled to complete work, gave up easily and did not always want to try academic work.[32] His IEP team, including his mother, determined that the setting III placement continued to be appropriate for him.[33] In grade eight, EK had a decrease in his ability to speak appropriately at school (74%), act appropriately (86%) and a significant decrease in his time engaged in learning (66%).[34] His case manager noted that his anger was very concerning.[35] In response, the District changed EK's classroom from a mixed 7th/8th grade group to all 8th grade students.[36] The school staff reported that EK had more success with processing, taking responsibility for his actions and self-regulating his behavior after the District changed his classroom.[37] His mother agreed the change in classroom was a positive move.[38]

Given these changes and the year long special education support, EK made progress in his eighth grade year. His teachers reported that he was a "…good speller (6th/7th grade level), good at fractions, can multiply and divide but struggles with negative and positive integers, equations (algebra)."[39] EK's progress report of October 10, 2012 confirmed that progress. He was reading 110 words per minute, "a small gain" from his

---

[31]Ex. 13.
[32] *Id.*
[33] *Id.*; T.574, ll.3-9.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] Ex. 14, p.2.
[39]Ex. 12.

earlier 108 words per minute.[40]  He had an increase in vocabulary and context in

reading.[41]  He improved in using capitalization in his writing.[42]  The IEP team prepared a

new IEP reflecting EK's academic needs.[43]  His mother agreed with the plan.[44]

### 1.   *Placement by Parent at Community Program – LifeSpan Day Treatment.*

In December of his eighth grade year, the Parent removed EK from the District

and placed him in a private day treatment program, Lifespan Day Treatment Program,

located in Burnsville, Minnesota.[45]  LifeSpan is a private, for profit day treatment

program rather than a school setting.[46]  EK was discharged after only a few weeks

because he engaged in a physical fight with another student.[47]  LaMadrid Wilson, a

licensed school social worker who worked with EK's IEP team, testified that "talk

therapy" such as that employed at LifeSpan is not supported by the current research for

students with ASD characteristics.[48]  Dr. Kristen Wiik, a pediatric neuropsychologist who

evaluated EK in May of 2013, testified that she would not have recommended cognitive

---

[40]Ex. 15.

[41] *Id.*

[42] *Id.* at p.2.

[43] Ex. 13.

[44]Ex. 14.

[45] T.409, ll.8-10.

[46]T.539, ll.15-19.  During the period of time that EK attended LifeSpan, the District offered to provide education to EK; however, he was discharged from LifeSpan before that was agreed to by the Parent. (*See* Ex. 16) Minnesota Rule provides that an average of one hour per day for one to one instruction should be provided for students in homebound settings. (*See* Minn. R. 3525.2325, subd. 5D) The District offered this programming but was prevented from delivering it when EK was terminated early from LifeSpan.

[47]Ex. 17; T.353, ll.21-25 – T.354, ll.1-18.

[48] T.354.

or "talk therapy" for EK when she did the evaluation because of his cognitive difficulties.[49]

Upon his discharge from LifeSpan, EK's IEP team met and discussed increasing his time in special education to a full day program in a separate school- a setting IV program.[50] However, EK and his mother wanted him to return to the setting III program at Anderson SPAN. The team, including the Parent, agreed to this.[51] The IEP team also discussed and agreed to conduct another Functional Behavioral Assessment ("FBA").[52]

##### 2.     *Second Functional Behavioral Assessment (FBA) April 8, 2013.*

The FBA report documented that during the first quarter of EK's eighth grade school year (2012-2013 school year), EK was speaking appropriately 75% of the day, acting appropriately 90% of the school day and in place 89% of the day.[53] EK was engaged in learning 82% of the day. From November 5, 2012 to December 3, 2012, EK's behavior declined.[54] On average he was speaking appropriately only 74 % of the time, acting appropriately 85% of the time and engaged in learning only 66% of the school day.[55] After he returned to Anderson SPAN from LifeSpan on January 25, 2013, his behavior continued to trend downward. From January to March 22, 2013, EK was

---

[49] T.556-557.
[50] Ex. 17, p.71.
[51] *Id.* at p.69; T.574, l.11.
[52] *Id.;* Ex. 22, p.82; Ex. 24.
[53] Ex. 27, p.125.
[54] *Id.*
[55] *Id.*

speaking appropriately only 74% of the day, and his percentage for being engaged in academic learning had gone down to 62%.[56]

During the first four months of the 2012-2013 school year, EK had 47 major behavioral incidents and after returning from Lifespan he had 26 additional major behavioral incidents.[57] Despite having 73 major incidents, EK was only suspended for 9.03 days.[58] His suspensions were for things like slapping another student in the face, repeatedly pushing staff after making harassing comments, throwing chairs at students or staff, severe provoking comments and harassment followed by physical aggression or threats of physical violence toward staff or students.[59] The FBA recorded that EK exhibited talking out and noise related behaviors at a rate of 30 to 60 times per hour.[60]

### 3.    *New Placement and New Behavior Plan.*

The IEP team, including EK's mother, reviewed the FBA results and agreed that EK needed more support to be successful in school.[61] The IEP team then drafted an IEP for a setting IV program,[62] and developed a new behavior intervention plan that was provided to the Parent.[63] Angela Davis, EK's county assigned case manager[64], was

---

[56]*Id.*

[57]*Id.*

[58]*Id.*

[59] *Id.*

[60] *Id.* at p.129.

[61] Ex. 27, p.130.

[62]Ex. 29.

[63]Ex. 31, T.436, l.13.

[64] Ms. Davis holds a BA from St. Cloud State. She holds no professional license. She worked for Power of Relationships, a private company that provides children's mental health case management services via contract with Hennepin County. *See* T.426-427. At the time she had worked with EK for a year and a half. *Id.*

present for this IEP team meeting and she testified that she and the rest of the team agreed that EK should be educated in a setting IV program.[65] EK's mother strongly advocated for the move to a setting IV program and she signed her permission for the move to a setting IV program at River Bend for the remainder of EK's eight grade year.[66]

### 4. *River Bend Setting IV Program April 2013-June 2013.*

EK made academic and behavioral progress while at River Bend.[67] He had no behavioral incidents at River Bend, and did well with a point system that used tangible rewards like earning points to "buy" items at the school store or earning time on the computer.[68] His mother and his Ms. Davis affirmed that the Student worked for points so that he could earn IPad or computer time and rewards from the school store. *Id.*

EK's progress report at the end of that school year, dated June 3, 2013, showed progress. It indicates an increase in reading fluency from 110 words per minute in grade seven[69] to 127 words per minute at the end of grade eight.[70] EK also was verbally appropriate 90% of the day and physically appropriate more than 97% of the day.[71]

---

[65]T.574, ll.16-19.
[66]Ex. 30, Ex. 31; T.348, ll.3-24.
[67] T.381, l.25; T.382, ll.1-7.
[68] T.447, ll.4-17; T.575, ll.5-14; T.451, ll.17-19; T.597; *see also* Ex. 255 [3/15/2013 meeting - Ms. Davis reports that EK "buys into" the point store, computer and IPAD time]; *see also* Ex. 29 [Ms. Davis reporting on 4/9/2013 that EK responds well to incentives like the point store.]
[69]Ex. 15.
[70]Ex. 24.
[71] *Id.* at p.160.

While EK was generally physically appropriate during his time at River Bend, he did have a major incident where he threw a desk.[72]

###    E.    Ninth Grade at Harrison (2013-2014 School Year).

EK moved to a high school program along with his peers for ninth grade in the 2013-2014 school year.[73]   He attended Harrison Education Center, a setting IV special education high school.[74]   Harrison is a state of the art high school with facilities that are equal or better than the District's other high school buildings.[75]   Harrison is less than ten years old and was built specifically to meet the needs of students with disabilities.[76]   The school's facilities include a full gymnasium, cafeteria, media center, science labs, and equivalent technology to other high schools including computers and smart boards.[77] Harrison also has a PAES lab that was designed to provide students with vocational opportunities and training.[78] Harrison has a coffee shop where students can learn real life work skills by applying for a position and working on campus to develop work skills.[79]

###    1.    *Research Based Programming; SAIL Data Collection System.*

The educational program at Harrison is research based.  The staff at Harrison use the SAIL Data Collection System, a well-researched approach to data collection that

---

[72] *Id.*
[73] T.575, ll.17-19.
[74] T.87, ll.8-10.
[75]T.867, l.13.
[76]T.852, l.25 – T.854, ll.1-2.
[77]Ex. 119, pp.1-13, 17-19.
[78]Ex. 119, pp.114-116.
[79]Ex. 4; T.104, ll.14-25.

allows staff to collect information about students' behaviors.[80]  The system is known as the SAIL data collection system and fosters pro social behaviors; **S**peaking appropriately, **A**cting appropriately, being **I**n place and **L**earning.[81]

Harrison has adopted the District's curriculum for general education students.[82] Harrison teachers are generally "highly qualified" (meaning have licensure in the subject they teach as well as special education licensure).[83] Harrison also has work experience classes to the general curriculum available to all students.[84]

## 2. *Behavior Management System.*

Harrison has a well-defined behavior management program with well-defined behavioral expectations for students.[85]  All staff are trained on the program and staff expectations were also made very clear.[86]  The behavioral program at Harrison and at River Bend includes a "point and level system".[87]  This allows students to gain independence as they increase appropriate behaviors.[88]  Expectations are shared with the students.[89]

## 3. *Social Skills Instruction.*

---

[80]T.855, ll.2-8.
[81]T.855, ll.18-25.
[82]T.852, ll.15-25.
[83]T.862, l.21.
[84]T.877.
[85]T.852, ll.15-19.
[86]*Id.*
[87]T.861, ll.7-25; T.557-558.
[88]T.861, ll.7-25; T.557-558; T.57, ll.2-4; T.59, ll.14-19.
[89]T.869, ll.3-24.

Social skills instruction at Harrison is embedded in what is going on in the classroom and the building throughout the school day.[90] Research suggests that embedding the teaching in the day is more effective than teaching a skill in isolation.[91] For example, after providing some direct instruction in how to resolve conflict with a peer, a teacher may identify a low-level, non-emotional issue that two students are having and help them use the conflict resolution skill and later help them use that skill in a larger issue in another environment.[92]

### 4.    *Mental Health Support.*

Mental health support is available at Harrison, starting with a safe, predictable classroom.[93] The mental health supports are built on the response to intervention model. In addition to safe, predictable classrooms, students also have social workers to talk with, psychologists on staff, counselors on staff and special education teachers and assistants to support students. [94] Harrison also has mental health providers on site that families can choose to connect with, as well as the ability to access psychiatrists from Fairview-University Hospital if families choose to do so.[95]

### 5.    *Student's Program at Harrison.*

---

[90]T.870, ll.14-21; T.155, ll.21-25; T.156, ll.1-10.
[91] T.781-82.
[92]T.871, ll.14-25; T.872, ll.1-10.
[93]T.877, ll.13-16.
[94]T.877.
[95]T.55-56; T.878, ll.1-18.

EK began his ninth grade year in the regular high school classrooms.[96] He had a short period of appropriate behavior and learning but then returned to bullying and teasing others, disrupting the classroom, being verbally and physically inappropriate. EK's IEP included long term reinforcement for behavior such as tangible rewards as well as immediate praise and feedback.[97]

In response to EK's behavior and academic needs, before winter break, he was moved to Ms. Kristin Spitzner's and Mr. Norris Anderson's classrooms.[98] Unlike the typical high school schedule at Harrison, students in those classrooms switched classes only once per day from Ms. Spitzner's homeroom to Mr. Anderson's room.[99] Fewer transitions during the day created less opportunity for students like EK to become engaged in behavior that detracted from learning. EK's classroom had three to four students, one licensed teacher and three special education paraprofessionals.[100] His classrooms were designed specifically for students with lower cognitive functioning like EK.[101] Some of the students, like EK, had ASD or ASD-like behaviors and needs.[102] The classrooms had adapted curriculum to meet those students' lower cognitive abilities.[103]

---

[96]T.574, ll.15-23.
[97]T.598; *see also* Ex. 261, p.381[IEP 2013].
[98] T.83, l.16 - T.84, l.9.
[99] T.81; T.82, ll.7-11; T.576, ll.15-18; T.595, ll.3-10.
[100] T.81; T.84, ll.3-4.
[101] T.72, ll.2-22.
[102] *Id.*
[103] T.89, ll.2-7.

EK began to have more progress in school after the classroom was changed near the winter break.[104] According to his skills worker (a non-school staff behavioral consultant provided by the County case management), Nicholas Puchalski, EK was able to trust the Harrison staff and Mr. Puchalski wrote that EK was making progress.[105] Ms. Wilson testified that EK began making progress after winter break and that he made specific progress in April of 2014 through the rest of the school year.[106] The Parent also testified that when Harrison moved EK to the smaller classrooms it was a better fit.[107] At an IEP team meeting on January 21, 2014, Mr. Puchalski reported that Harrison was the only school that could accommodate EK's needs.[108]

### 6.    *Placement at Prairie Care by Parent.*

EK was placed by his mother in a partial hospitalization program at Prairie Care from February 25, 2014 to March 12, 2014. EK was demitted from that program because of his aggressive behaviors, (T. 579, ll. 2-14),[109] and returned to Harrison on April 8, 2014.

### 7.    *Return to Harrison in April 2014.*

---

[104] T.364, ll.8-18.
[105] T.332, ll.5-9; Ex. 63.
[106] T.364, ll.8-18.
[107] T.422-423.
[108] Ex. 63.
[109] EK's mother initially testified that he was removed because the other children there were more severe than EK. T.400, ll.1-13. Every other witness testified that EK was demitted from Prairie Care for fighting with other children. The Parent later acknowledged that EK was demitted from Prairie Care because of being physically aggressive. T.407, ll.220-225.

When EK returned to Harrison, he had no further suspensions from April 8, 2014 to the end of the school year.[110] Mr. Kurtz testified that EK made strides in socialization including mediating conflicts he had with other students instead of the situation escalating as it had before. EK began to make the decision to remain at school after a conflict instead of going home. EK began to make more friends.[111] Mr. Kurtz also became the point person for EK's mother to provide her with information about EK's behaviors, progress and needs. This change helped to provide clearer communication with the Parent and may have impacted EK's behaviors as well.

EK also made academic progress. Mr. Norris Anderson was one of his teachers in the self-contained classrooms and he testified that EK's greatest progress was in English and reading. EK was meeting and exceeding his reading fluency goals, he also was one of the most willing students in the class to read aloud, and enjoyed taking that role.[112] Mr. Anderson further testified that during the fourth quarter of 2014, EK met all of the SAIL criteria except for the on task portion, which was still at 80%. This was an increase in SAIL criteria and participation in Mr. Anderson's classroom.[113] EK was not suspended when he was being instructed by Mr. Anderson and this was an increase in success for him.[114]

The table below reflects data as found in the exhibits admitted at hearing and shows an increase in all school appropriate behaviors.

---

[110] T.827, l.9 - T.828, l.1; Ex. 6; Ex. 123.
[111] T.650, l.23- T.651, l.23.
[112] T.769, l.20- T.770, l.14.
[113] T.773, l.23- T.774, l.10.
[114] T.779, ll.5-12.

| Exhibit No. | Description | Page No. | Speaking | **Acting** | In Place | Learning |
|---|---|---|---|---|---|---|
| D 13 | IEP 10/10/12 SPAN Setting III/ grade 8 | P. 54 | 76% | 89% | 88% | 71% |
| D 15 | Progress report 12/3/2012 SPAN /grade 8 | P. 65 | 74% | 86% | 87% | 66% |
| D 25 | 3/15/2013 (beginning referral to Setting IV) | P. 89 | 74% | 82% | 82% | 62% |
| D 27 | FBA 4/8/2013 SPAN grade 8 | P. 125 | 74% | 85% | 85% | 66% |
| D 34 | Progress report 4/9/13 River Bend Setting IV | P. 160 | 90 % (range) | 97 (one incident since coming to River Bend of throwing a desk) | 85% | 72% |
| D 48 | 10/8/203 9th grade change to smaller room discussed with parent | PP.181,183 | "maintain good behavior for large chunks of the day per point sheet" | "learning to ask for a break" | | |
| D 51 | 11/7/13 progress report/9th grade Harrison | P.188 | 97% | 95% | 86% | 62% |
| D 63 | 1/21/14 | P. 200 In Spitzner/Anderson's class | Angela Davis reporting he has made "huge gains" | | | |
| D 94 | 4/28/14 progress report | P. 267 | 94% | 91% | 93% | 82% |
| D 123 | IEP 5/1/2014 9th grade Setting IV | P. 6- First semester 9th | 96% | 96% | 92% | 73% |

| | | grade | | | | |
|---|---|---|---|---|---|---|
| D 123 | " " | P. 6 – Second semester (no suspensions from return on 4/9/2014 to 5/5/2104) | 95% | 94% | 94% | 85% |

***Dr. Wiik's Evaluation of EK.*** Dr. Kristin Wiik, a neuropsychologist who worked with EK through Hennepin County Medical Center, conducted an evaluation of EK in May of 2013. She found that he had an IQ of 61, a mood disorder, oppositional defiant disorder, mild intellectual disability and Autism Spectrum Disorder by history.[115] She did not conduct academic testing except for a screening of math and reading.[116] She opined that "EK's recent placement in a self-contained, Federal Level IV setting may be beneficial in providing more individual attention and supports for behavior management."[117] Dr. Wiik made a number of recommendations for programming for EK.[118] They included providing explicit rules, frequent positive reinforcement for appropriate behavior, social skills instruction, close monitoring to help him stay on task and a structured environment where works for a period of time and then takes breaks.[119]

---

[115] Ex. 270, p.428.
[116] T.504; T.511, ll.2-8.
[117] Ex. 270.
[118] *Id.* at 428-429.
[119] *Id.*

Dr. Adams testified that all of those recommendations were in place for EK at Harrison.[120]

Dr. Wiik testified that with EK's level of needs, it was challenging to program educationally for him.[121] She testified that traditional social skills teaching might be difficult for EK given his cognitive limitations and it would have to be tailored for him.[122] She testified that EK's standard scores on academic tests were above what one would expect given his IQ of 61.[123] Dr. Wiik's evaluation was consistent with the District's October 2011 evaluation of EK.[124]

## III. THE SUSPENSIONS DID NOT VIOLATE THE IDEA

### A. School Officials Have Authority to Suspend a Child with a Disability.

School officials have authority to suspend students for violation of reasonable school rules as long as procedural requirements are met when doing so. Minn. Stat. § 121A40 to 121A.56 (Minnesota Pupil Fair Dismissal Act); *Goss v. Lopez*, 419 U.S. 565, 576, 95 S. Ct. 729, 737, 42 L. Ed. 2d 725 (1975). In the IDEA, Congress made clear that school officials retain their authority to suspend students, even students with disabilities. "School personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct."20 U.S.C. § 1415(k)(1)(A).

---

[120] T.120, ll.16-24.
[121] T.517, ll.1-6.
[122] T.520, ll.14-22.
[123] T.540, ll.21-24, Ex. 432.
[124] Ex. 114, Ex. 270.

**B.** **Congress Limited School Official's Authority to Suspend Students in Only Three Respects.**

School officials' authority to suspend students for violations of school rules has been restricted by Congress in the IDEA in only three ways. The first restriction pertains to length. The second restriction pertains to procedural requirements which must be followed. The third restriction pertains to FAPE.

**1.** *Restriction As To Length.*

The first restriction on school officials' authority to suspend students pertains to the length of a suspension. Under the IDEA, school officials may not issue a suspension which runs more than ten consecutive school days for a single behavior incident. 20 U.S.C.A. § 1415(k)(1)(C); 34 C.F.R. 300.350(b). This limitation applies only where two circumstances are present: (1) the student is a child with a disability, and (2) the behavior for which suspension is proposed is behavior which is a manifestation of the student's disability. 20 U.S.C. 1415(k)(1)(C); 34 C.F.R. 300.350((c). Both conditions must be present for the restriction to apply.

If the student is a child with a disability but the behavior for which suspension is proposed is not a manifestation of the child's disability, the IDEA does not limit school officials' authority to issue a suspension which runs for more than ten consecutive school days. 20 U.S.C.A. § 1415(k)(1)(C); 34 C.F.R. 300.350(c).

**2.** *Restriction As To Procedural Requirements.*

The second restriction on school officials' authority pertains to procedures which must be followed. Under the IDEA, school officials' retain their authority to issue a

series of short suspensions in response to separate behavior incidents by the same child. There is no limitation on the number short suspensions a disabled student may receive in one school year. This is true even if the series of short suspensions results in a "change of placement."[125]   Both the IDEA and the federal regulations are clear that school officials have authority to issue a series of short suspensions which result in a "change of placement." The IDEA provides:

> Placement in alternative educational setting
> (1) Authority of school personnel
> (A) Case-by-case determination
> School personnel may consider any unique circumstances on a case-by-case basis *when determining whether to order a change in placement for a child with a disability who violates a code of student conduct.*

20 U.S.C.A. § 1415(k)(1)(A) (emphasis provided). The federal regulations similarly provide:

> Case-by-case determination. School personnel may consider any unique circumstances on a case-by-case basis *when determining whether a change in placement, consistent with the other requirements of this section, is appropriate for a child with a disability* who violates a code of student conduct.

34 C.F.R. § 300.530 (emphasis provided). Thus, both the IDEA and the federal regulation make it clear that school officials retain authority to issue a series of short suspensions that constitute a "change of placement" for the disabled child. A "change of placement"

---

[125] 34 C.F.R. § 300.536 sets out the conditions which must exist for a series of short term suspensions to amount to a "change of placement."

occurs when the series of short suspensions accumulate to more than ten school days in a school year and a number of other factors are met.[126]

While it is clear that school officials retain their authority to make a "change of placement" through a series of short term suspensions, it is equally clear that school officials may not simply suspend a disabled student over and over without also addressing the behavioral needs which gave rise to the suspensions. When the days of suspension accumulate to more than ten school days in a school year and the other conditions which create a "change of placement" are present, school officials must see

---

[126] The regulations provide:

> For purposes of removals of a child with a disability from the child's current educational placement under §§ 300.530 through 300.535, a change of placement occurs if—
> (a)(1) The removal is for more than 10 consecutive school days; or
>   (2) The child has been subjected to a series of removals that constitute a pattern—
>     (i) Because the series of removals total more than 10 school days in a school year;
>     (ii) Because the child's behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals; and
>     (iii) Because of such additional factors as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another.

34 C.F.R. § 300.536(a). It is the school district which makes the determination whether a pattern of removals creates a "change of placement":

> The public agency determines on a case-by-case basis whether a pattern of removals constitutes a change of placement.

34 C.F.R. § 300.536(b)(1). The school district's determination is subject to review through due process and judicial proceedings. 34 C.F.R. § 300.536(b)(2).

that certain procedures are followed. These procedures are in place to ensure that the needs of the disabled student are met. Again, it is not a violation of the IDEA for school officials to issue a series of short suspensions in response to a series of behavior infractions, even if the series of suspensions totals more than ten school days in a school year and constitutes a "change of placement" for a child with a disability. Going over ten days in situations which constitute a "change of placement" merely triggers a number of procedural steps which the school district is required to follow.

The first step triggered is the requirement that a manifestation determination be conducted. 20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. 300.350(e). The manifestation determination must be made "*within 10 school days of any decision to change the placement* of a child with a disability because of a violation of a code of student conduct."[127] 20 U.S.C. § 1415(k)(1)(E)(i) (emphasis provided). Again, it is important to

---

[127] The relevant statutory language is at subsection (k)(E)(i):

> Manifestation determination
> (i) In general
> Except as provided in subparagraph (B), *within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct,* the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine--
> > **(I)** if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
> > **(II)** if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

20 U.S.C. § 1415(k)(1)(E) (emphasis provided).

note that as is evident from this statutory language, Congress expressly contemplated that school officials would have situations where they would need to use suspensions, even if those suspensions amounted to a "change of placement." The manifestation determination is to be made by "the parent, and relevant members of the IEP Team". *Id.*

Depending on whether the behavior is determined to be a manifestation of the student's disability, one of two things may follow. If the behavior is not a manifestation of the student's disability, "the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities, except [that the child must be provided educational services.]" 20 U.S.C. § 1415(k)(1)(C).

If the school district, the parent, and relevant members of the IEP Team determine that the conduct was a manifestation of the child's disability, a second procedural step is triggered. This procedural step requires the IEP team to conduct a functional behavioral assessment and implement a behavior intervention plan for the child. 20 U.S.C. § 1415(k)(1)(F)(i). If the child already has already had a functional behavioral assessment and has a behavioral intervention plan, the IEP Team must "review the behavioral intervention plan" and "modify it, as necessary, to address the behavior." 20 U.S.C. § 1415(k)(1)(F)(ii). The specific statutory language is as follows:

> (F) Determination that behavior was a manifestation
>
> If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team shall--

> **(i)** conduct a functional behavioral assessment, and implement a behavioral intervention plan for such child, provided that the local educational agency had not conducted such assessment prior to such determination before the behavior that resulted in a change in placement described in subparagraph (C) or (G);
>
> **(ii)** in the situation where a behavioral intervention plan has been developed, review the behavioral intervention plan if the child already has such a behavioral intervention plan, and modify it, as necessary, to address the behavior.

20 U.S.C. § 1415(k)(1)(F)(ii); *See also* 34 C.F.R. 300.350(f)(1).

After the suspension, the child must be returned to the placement from which he was removed, unless the code of conduct violation involved a weapon, drugs, or serious bodily injury; or unless the parent and school district agree to a change of placement:

> **(iii)** except as provided in subparagraph (G), return the child to the placement from which the child was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan.

20 U.S.C. § 1415(k)(1)(F)(iii); *see also* 34 C.F.R. 300.350(f)(1).

Again, nothing in the IDEA limits school officials' authority to issue a series of short term suspensions which accumulate to more than ten school days in a school year, even if the conditions surrounding the suspensions amount to a "change in placement." Congress merely directed that if school officials decide to do so, school officials must ensure that in addition to responding to the code of conduct violations with suspensions, they also ensure that the behaviors which gave rise to the infractions are addressed by conducting or reviewing the student's functional behavioral assessment and creating or modifying the behavior intervention plan as needed.  20 U.S.C. § 1415(k)(1)(f)(i)-(iii).

The requirement that school officials follow the "change of placement" decision with creation/review of the functional behavior assessment and creation/modification of the behavior intervention plan is also reflected in the federal regulations:

> (e) Manifestation determination.
>
> (1) Within 10 school days *of any decision to change the placement of a child with a disability* because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—
>
> > (i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
> >
> > (ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.
>
> . . .
>
> (f) Determination that behavior was a manifestation. If the LEA, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team must—
>
> (1) Either—
>
> > (i) Conduct a functional behavioral assessment, unless the LEA had conducted a functional behavioral assessment before the behavior that resulted in the change of placement occurred, and implement a behavioral intervention plan for the child; or
> >
> > (ii) If a behavioral intervention plan already has been developed, review the behavioral intervention plan, and modify it, as necessary, to address the behavior; and
>
> (2) Except as provided in paragraph (g) of this section, return the child to the placement from which the child was removed, unless the parent and the LEA agree to a change of placement as part of the modification of the behavioral intervention plan.

34 C.F.R. § 300.530 (emphasis provided).

Congress has not taken away the authority of school officials to suspend students for violations of the student code of conduct, but Congress has restricted that authority in terms of length (maximum length of 10 school days per incident), and in terms of the procedural requirements which must follow any decision to make a "change of placement" for a child with a disability.

### 3. *Restriction As To FAPE.*

The third restriction on school officials' authority to suspend students under the IDEA flows from a student's right to a free appropriate public education. If a student is removed from school for so many days in a single school year that the student is unable to make educational progress, there will be a denial of the student's right to a free appropriate public education. This makes sense. If school officials repeatedly suspend a student in response to code of conduct violations and do nothing more, then school officials are not addressing the student's behavioral needs in a way that helps the student access the educational opportunities available to him. This is why Congress put in place the procedural steps which are triggered when suspensions constitute a "change of placement." When these procedural steps are triggered, the school district, the parent, and relevant members of the IEP team review the functional behavioral assessment and design changes to the student's behavioral intervention plan in order to help  provide the supports the student needs to stay in school and access the learning opportunities available.

In those situations where the school district, the parent, and the IEP team either fail to review the functional behavior assessment and change the behavioral interventions, or review the functional behavioral assessment and do not design changes to the behavioral plan that help the student stay in school and access the educational opportunities available, the student may suffer a lack of adequate progress in school because of ongoing suspensions. In these cases, the ALJ may view the facts as a whole and find that the school district has denied the student a free appropriate public education.

**C.    Minneapolis Complied with the IDEA's Requirements When It Suspended EK.**

### 1.    *Requirement As To Length.*

The IDEA's restriction as to suspension length is not at issue in the *instant* case. EK was not given any suspensions which were for more than ten consecutive school days.

### 2.    *Requirement As To Procedures.*

As to the procedural requirements related to a "change of placement," these requirements were amply met by Minneapolis as discussed *infra.* But as an initial matter, the series of short term suspensions that EK received did not meet the criteria to be a "change of placement" because the series of suspensions did not have the statutory hallmarks of a "change of placement." *See* C.F.R. 300.536(a)(1)(ii)-(iii). The behaviors were not "substantially similar," were not unreasonable in "length," and were not temporally "proximate" to one another. *Id.* A chart summarizing the suspension information follows:

| Date | Behavior | Behavior Type | Suspension Time | No. of Days Since Last Suspension | Response/ Cumulative days |
|------|----------|---------------|-----------------|-----------------------------------|---------------------------|
| 9/24/13 | Student used classroom phone, calling someone and pretended to be district employee, behavior lasted over an hour. Student told staff "I'll get you when I get back." | Disruption to learning for over an hour | 1.33 days | (in school about 1 month) | |
| 9/26/2014 | Threated to kill staff, push her out of chair, threw water on peer | Threat to adult | 1.77 | 2 days | 2.5 cumulative days/ IEP meeting set up /call to home |
| 10/9/2013 | Kicked peer | Assault to male peer | 1.0 | 13 days | 3.50 cumulative days/ Kurtz called home |
| 11/25/2013 | Fight initiated by female peer. Head locked female student & hit her in face | Assault to female peer | 1.67 | 6 weeks | Satterlie called home |
| 12/9/2013[128] | Racial remarks and threats to staff ("Bring | Verbal harassment of staff/ | 1.0 | 1 week | Kurtz called parent and met with |

---

[128] Both Ex. 296, p.502 and Ex. 7, p.33 show that the Student finished the day on 12/9/2013 and was suspended on 12/10/2013.

| | | | | | |
|---|---|---|---|---|---|
| | your white ass"/"want to smack the shit out of you"/ slammed door on staff/threw items at peer | threw items at peer | | | student before he left for the day |
| 12/11/2013 | Threats to staff, racial remarks, let angry peer in room/trashed room | Same plus letting angry peer in | 1.0 | 1 day | |
| 12/12/2013 [129] | **No incident** | | | | Bechel called home to process with parent |
| 12/19/2013 | Threats to staff when asked to work | Threat to staff | 1.0 | 8 days | 6.17 days |
| 12/20/2013 [130] | **No incident** | | | | Spitzner contacted parent about yesterday's incident |
| **Second Semester** | | | | | |
| 1/14/2014 | Tried to take staff phone. Did well until last period when he flipped desk | Attempted theft/ property destruction | 2.0 | Break until 1/2/2014. 12 days since last incident | Ate lunch with Kurtz to get back on track. 8.17 days **Moved to** |

[129] The Order in error cites 12/12/2013 as an incident; however, Ex. 296, pp.502-503 indicate no incident on that day as does Ex. 7, p.33. The next suspension was instead 12/12/2013. *See* Ex. 7, p.33, Ex. 296, p.503.
[130] No incident occurred on 12/20/2013. Instead, the Student was suspended on 12/19/2013 for 12/20/2013. *See* Ex. 7, p.33, Ex. 296, pp.502-503.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | **Anderson's class (D.Exh.63)** |
| 2/5/2014 | Stole staff phone on 2/4 and denied/blamed peer | Theft/lying | 2.00 | | Kurtz met with student/ manifestation meeting set for 2/11 |
| 2/7/2013 | Involved in food fight | Food fight | .33 sent home for rest of day (2 periods) | | |
| | | | | | |
| 2/10/2014 | Let peer in who was chasing another | Insubordination | .5 sent home for 3 periods | | **11 days** |
| | | | | | |
| 2/11/2014[131] | **Manifestation Meeting** | | | | **Team agreed to Kurtz as point person for student and parent** |
| 2/12/2014 | Threats to peer, called peer "Down Syndrome Bitch"/ threw tables & chairs | Threats to staff and peers, harassment / property destruction | 1 day | | **12 days** |

---

[131] There was no incident on 2/11/2013. Instead, note that Ex. 7 tracks the date of the incident but the next day there may be an entry for the staff call to home or other activity. *See* Ex. 7, p.34 showing incident on 2/10 with Student suspended for 2/11/14 and Parent called on 2/11/2014. *See also* Ex. 296, p.507.

First, the behaviors which gave rise to the suspensions were not "substantially similar" as required for a "change of placement." *See* 34 C.F.R. 300.536(a)(1)(ii). Threatening to kill a staff member (9/26/2013) is not substantially similar to stealing a cell phone (2/5/2014). Head locking a female student and hitting her in the face (11/25/2013) is not substantially similar to using the classroom telephone to call someone while pretending to be a district employee (9/23/2013). Threatening and harassing a peer calling him "Downs Syndrome" (2/12/2014) is not substantially similar to letting some angry students into a room to trash the room (12/11/2013). Being involved in a food fight (2/7/2014) is not substantially similar to getting angry and flipping a desk over (1/14/2013).

Second, the length of the removals was reasonable, *see* 34 C.F.R. 300.536(a)(1)(iii), given that despite the particularly egregious behavior exhibited by EK, he received no suspension that ran for 10 consecutive days, no suspension that ran for 5 consecutive days, and in fact, EK did not receive even one suspension that ran for 3 consecutive days. Instead, again despite the particularly violent and threatening behavior exhibited by EK, school officials issued only two suspensions that ran for 2 days, and all of the rest of the suspensions were for one school day or even less than one school day. Thus, as to length, this factor for "change of placement" was not met; the suspensions were very short, reasonable in light of the circumstances, and the maximum length that EK was out of school was for 2 days, and this occurred on only two occasions during the entire school year.

By and large the suspensions were also not temporally proximate to one another. *See* 34 C.F.R. 300.536(a)(1)(iii). The first suspension occurred during the third week of September, but the suspension that took EK over ten days did not occur until almost a full semester later, during the first week of February.  When the series of suspensions begins early in one school semester and runs full well into the second school semester, it is difficult to say that the suspensions were issued in close proximity.  In sum, when considering the factors of similarity, length, and proximity, it is quite clear that EK's suspensions did not amount to a "change of placement."

But even if the suspensions amounted to a "change of placement," school officials are authorized to make a "change of placement," and the school officials from Minneapolis followed IDEA's requirements when they did so.  They conducted the manifestation determination as required.  They reviewed EK's functional behavior assessment as required.  And they modified his behavioral intervention plan as appropriate.  Specifically, Mr. Kurtz met with EK on February 5, 2012, after EK received a two day suspension for stealing a staff member's cell phone and then lying by saying another student committed the theft.  This suspension was the one that took EK's total over ten days.  The manifestation determination meeting took place within ten days of the suspension,[132] as required by the IDEA.  It took place on February 11, 2012.  (Ex 276, Ex. 277)  The IEP team reviewed the functional behavioral assessments from 4/8/2013 and 10/14/11 and reviewed EK's IEP.  *Id.*  They reviewed EK's behavioral history and

---

[132] Assuming for the sake of argument that this suspension created a "change of placement."

discussed current behaviors which were posing difficulties for EK. (Ex. 277). They discussed strategies such as putting clear expectations on the board, using a verbal or physical prompt to remind him like nodding head toward door, using positive praise as he responds well to that, earning extra time on the computer or IPAD and continuing to work with Mr. Kurtz as that was going well. *Id.* Ms. Spitzner noted that she was in the process of creating a new stand-alone behavior intervention plan for EK.[133] The team agreed that Ms. Spitzner should continue to work on a revised the Behavior Intervention Plan (BIP) to address the behaviors.[134] The team also agreed on a plan for the teacher to call home between 9-11 a.m. to help EK complete homework sent home on days that he was suspended.[135]

The team met again on February 24, 2014, after EK received a one day suspension for threatening a staff member and calling another student "Down Syndrome."[136] They conducted a manifestation determination, continued to discuss changes to the behavior intervention plan, and the "alternative education services" which would be provided to EK when suspended.[137] *Id.* On February 26, 2014 the District sent the Parent a prior written notice along with the revised behavior intervention plan.[138] The changes the team

---

[133] Ex. 277.
[134] *Id.*
[135] *Id.*
[136] Ex. 278.
[137] Mr. Puchalski testified that EK got homework packets. T.288, ll.22-25. Dr. Adams testified that homework packets were sent when EK's cumulative days of suspension totaled six. T.125, ll.12-13.
[138] Ex. 279.

implemented were successful, so much so that EK did not receive even one more day of suspension for the entire rest of the school year.

The purposes of the procedural protections which are triggered when school officials make a "change of placement" is to ensure that school officials are not responding to code of conduct violations with suspensions alone, but instead are ensuring that the parent and relevant members of the IEP team review the behavioral assessment information and make changes to the student's behavior plan if warranted. That is exactly what Minneapolis did here. The ALJ's conclusion that Minneapolis violated the IDEA was in error.

### 3. *Requirement as to FAPE.*

The ALJ found that EK made educational progress and was provided a FAPE by Minneapolis in both 8th and 9th grade. (Decision, p. 19, Conclusion of Law 7) Although the ALJ determined that the suspensions "harmed" EK, there is no dispute that EK was provided a FAPE. As discussed below, every suspension can be said to "harm" a student, but that is not the same as a denial of FAPE. The ALJ concluded that Minneapolis provided EK a FAPE, and neither the Party has appealed that part of the ALJ's decision.

## V. THE ALJ COMMITTED AN ERROR BY AWARDING COMPESNATORY EDUCATION WHERE THERE WAS NO DENIAL OF FAPE

Compensatory education services are available when a school district fails to provide a free appropriate public education. *Miener By & Through Miener v. State of Mo.*, 800 F.2d 749, 753-54 (8th Cir. 1986)("Accordingly, we hold that the plaintiff is entitled to recover compensatory educational services if she prevails on her claim that the

defendants denied her a free appropriate education in violation of the EHA.").  The denial

of FAPE is a prerequisite for an award of compensatory education, and conversely, where

a school district has provided a free appropriate public education compensatory education

is not available.  *See M.M.,* 512 F.3d 455, 461.[139]

The ALJ erred when he ordered compensatory education services notwithstanding

the fact that Minneapolis had provided EK a free appropriate public education.

Regarding the District's evaluation of EK, the ALJ concluded:

> The School District's October 2011 evaluation of Student was
> sufficiently comprehensive to identify all of Student's special
> education and related service needs, whether or not commonly
> linked to the disability categories in which Student has been
> classified, as required by law.  All sources of information for the
> evaluation were documented and carefully considered as required by
> law.

Decision at p. 18, Conclusion of Law Number 3.  Regarding the provision of a free

appropriate public education the ALJ concluded:

---

[139] Other Circuit Courts of Appeal also hold that the foundational element to an award of
compensatory education is the denial of FAPE. As the Third Circuit recently concluded,
"[t]he purpose of compensatory education is not to punish school districts for failing to
follow the established procedures for providing a free appropriate public education, but to
compensate students with disabilities who have not received an appropriate education."
*C.W. ex rel. Louise W. v. The Rose Tree Media Sch. Dist.,* 395 F. App'x 824, 828 (3rd
Cir. 2010).   In *C.W.,* the Third Circuit held that where the student "was not denied an
appropriate education, the imposition of compensatory education would not further the
purposes of IDEA, and, therefore, we will also affirm the District Court's refusal to grant
such relief." *Id.* at 828.  "Compensatory education involves discretionary, prospective,
injunctive relief crafted by a court to remedy what might be termed an educational deficit
created by an educational agency's failure over a given period of time to provide a FAPE
to a student." *G. ex rel. RG v. Fort Bragg Dependent Schs.,* 343 F.3d 295, 309 (4th Cir.
2003).  "Denial of a FAPE is a prerequisite to an award of compensatory services."
*Walker v. D.C.,* 786 F. Supp. 2d 232, 238 (D.D.C. 2011) *citing Reid v. Dist. of Columbia,*
401 F.3d 516, 518 (D.C.Cir.2005).

The School District provided Student a FAPE during all periods relevant here, which was from May 5, 2012, to the present, except for those times that Student was placed by his mother at non-District day treatment providers.

Decision at p. 19, Conclusion of Law Number 7.

Despite the fact that Minneapolis had provided EK a free appropriate public education during both school years, the ALJ ordered the District to provide EK compensatory services in the form of retaining Dr. Kristen Wiik to assist the IEP team during the 2014-2015 school year:

The School District unilaterally changed Student's placement through a pattern of suspensions and exclusions that totaled more than ten school days in one school year that caused Student a loss of education benefit. Student is entitled to compensatory education to compensate him for that loss.

Decision at p. 19, Conclusion of Law Number 9. The ALJ's award of compensatory education was an error and is not supported by the law.

The Eighth Circuit Court of Appeals decision in *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 460 (8th Cir. 2008) is controlling in this case. M.M. was a student with significant behavioral needs and she was suspended more than ten school days during the 2003-2004 school year and was also administratively transferred to a different school against her parent's wishes following one of the suspensions. After reviewing the administrative record, the district court found that during the 2003-04 school year M.M. was suspended for *a minimum of sixteen (16) days*. *M.M. v. Special Sch. Dist. No. 1*, No. CIV 05-2270 RHK/RLE, 2006 WL 2571229, at *22 (D. Minn. Sept. 5, 2006) *rev'd sub nom. M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455 (8th

Cir. 2008)("As such, the Record demonstrates that M.M. was suspended for a minimum of sixteen (16) days during the 2003-04 school year".)(emphasis provided). The district court concluded that although M.M. made some academic progress, "the suspensions were numerous enough to impact upon M.M.'s education." *Id.* After concluding that the suspensions had harmed M.M., the district court next looked at whether M.M. was deprived free appropriate public education.

> Accordingly, while there is certainly evidence that M.M. made academic progress during the 2003-04 school year, the ALJ's conclusion, that the suspensions were numerous enough to impact upon M.M.'s education, is supported by a preponderance of the evidence.
>
> That being said, compensatory benefits are only proper where the ALJ "finds that the district has not offered or made available to the child a free appropriate public education in the least restrictive environment and the child suffered a loss of educational benefit." *Minnesota Statutes Section 125A.091, Subdivision 21.* Accordingly, any award of compensatory benefits must be predicated on a failure of the District to satisfy its FAPE obligations.

*M.M.,* 2006 WL 2571229, at *23. The district court went on to review the evidence from the administrative hearing and concluded that the school district had violated M.M.'s FAPE rights when it failed to review and revise the student's IEP following the suspension that resulted M.M. being administratively transferred. The district court awarded compensatory education. *Id.* at 24.

The Eighth Circuit Court of Appeals reversed the district court. *M.M.,* 512 F.3d at 461. The Court of Appeals held that where the school district had provided a FAPE, it was an error to award compensatory education services even if the student suffered a loss of educational benefit as a result of the days of suspension and administrative transfer.

*M.M.* 512 F.3d at 461. The Eighth Circuit expressly recognized that any child will suffer an educational loss when suspended. *Id.* But an educational loss arising from suspensions standing alone does not warrant an award of compensatory education services. *Id.* The Eighth Circuit held that a denial of FAPE is a prerequisite to an award of compensatory education services. *Id.*

Moreover, the ALJ and the district court applied the wrong legal standard in determining that M.M. was denied a FAPE in the 2003–2004 school year. A school district meets its IDEA obligations if the student's IEP is "reasonably calculated to enable the child to receive educational benefits." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). An IEP "need not be designed to maximize a student's potential commensurate with the opportunity provided to other children." CJN, 323 F.3d at 638–39 (quotation omitted). Rather, "the requirements of the IDEA are satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit." *Neosho R–V Sch. Dist. v. Clark,* 315 F.3d 1022, 1027 (8th Cir.2003) (quotation omitted); *see Fort Zumwalt Sch. Dist. v. Clynes,* 119 F.3d 607, 612 (8th Cir.1997).

Though M.M.'s November 2003 IEP was appropriate when adopted, the district court upheld the ALJ's conclusion that M.M. "suffered a loss of educational benefit" as a result of the subsequent suspensions and the transfer to Olson. It is doubtless true that any child suffers a loss of educational benefit when suspended, and a transfer caused by serious misbehavior cannot be anything but an educational setback. Yet M.M.'s year-end progress report stated that she made adequate progress on her academic goals during the 2003–2004 school year, and a social worker testified that she made behavioral progress after her transfer to Olson. *Compare CJN,* 323 F.3d at 642–43. This is not a case like *Neosho,* where the IEP "did not appropriately address" the student's behavior problem. 315 F.3d at 1028. When a child's primary disability is a behavioral disorder, the school district does not violate IDEA simply because the child failed to achieve the IEP's behavioral goals.

For these reasons, the award of compensatory special education benefits and attorneys' fees for the 2003–2004 school year is reversed.

*M.M.,* 512 F.3d 455, 461 (8th Cir. 2008).

The Eight Circuit Court of Appeal's decision in *M.M.* is controlling in the *instant* case. The ALJ concluded that EK was provided a free appropriate public education. The ALJ's award of compensatory education, therefore, was improper.

In addition, the ALJ made other errors of law. First, he applied a "ten day rule" or "ten day threshold", *see* Decision at p. 24, as if there were such a rule or threshold in the IDEA which prohibits school officials from suspending a child with a disability more than ten school days in a school year. As discussed *supra,* the IDEA does not restrict school officials to ten days, but rather requires school officials who make a "change of placement" to ensure that the parent and relevant IEP team members review the functional behavior assessment and modify the behavior plan as warranted so that suspensions are not the sole response to code of conduct violations.

The second mistake of law the ALJ made was to "prorate" the 13 school days to 19.5 school days per school year. *See* Decision at p. 24. The ALJ cites no legal authority for this "proration" and indeed, none exists. The federal regulations define "day," "business day," and "school day." *See* 34 C.F.R. § 300.11. The regulations define "school day" to mean "any day, including a partial day that children are in attendance at school for instructional purposes." *Id.* The federal regulations do not contemplate prorating school days for any purpose. It is also important to note that even if the IDEA allowed prorating of school days, the ALJ's decision to do so was unwarranted and did

not correspond to the facts in this case.  The parent and relevant IEP team members met on February 11th and again on February 24th to review the functional behavioral assessments and revise the behavior intervention plan.  After the changes were implemented, EK had no more suspensions for the rest of the year.  Therefore, it was an error for the ALJ not to recognize and account for the positive effects of the revisions to the behavior plan.  The ALJ should not have "prorated" the school days as if these changes did not take place. Given that EK had no more suspensions after he returned to Minneapolis from PrairieCare, what is to say he also would not have done as well from February 24th to April 9th if he had stayed at Minneapolis rather than been placed by his mother at PrairieCare.  The ALJ's proration of days was unfair to Minneapolis, did not reflect the facts at hand, and was without support in the law.

## VI.    PLAINTIFF'S PETITON FOR ATTORNEY FEES SHOULD BE DENIED

Plaintiff is not the prevailing party.  Plaintiff did not succeed on her claims except insofar as the ALJ ordered compensatory education services in the form of an order requiring Minneapolis to retain Dr. Kristen Wiik to work with the IEP team for the 2014-2015 school year.  As discussed *supra*, the ALJ's order was in error both factually and in law. The ALJ's order should be reversed and accordingly, Plaintiff's petition for attorney fees and costs should be denied.[140]

## VII.   CONCLUSION

---

[140] Minneapolis reserves its right to contest prevailing party status and the reasonableness of the attorney fees and costs if the Court upholds the award of compensatory education.

Based on all of the forgoing, Minneapolis Public Schools respectfully requests that the ALJ's order of compensatory services be reversed and Plaintiff's petition for attorney fees and costs be denied.

Respectfully submitted,

**BOOTH LAW GROUP LLC**

Dated: June 30, 2015

_s/Roseann T. Schreifels_
Roseann T. Schreifels, #0257278
Laura Tubbs Booth, #186910
10520 Wayzata Blvd, Suite 200
Minnetonka, MN 55305
(763) 253-4155
rschreifels@boothlawgroup.com
lbooth@boothlawgroup.com
***Attorneys for Defendant Special School
District No. 1, Minneapolis Public Schools***