# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

E.K., by and through his Parent and
Natural Guardian, E.K.,

        Plaintiff,

v.

MINNEAPOLIS PUBLIC SCHOOLS,
SSD NO. 1,

        Defendant.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 14-4273 (MJD/JSM)

Margaret O'Sullivan Kane, Kane Education Law, LLC, Counsel for Plaintiff.

James K. Martin, Laura Tubbs Booth, and Roseann T. Schreifels, Booth Law Group LLC, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Judgment on the Administrative Record and Motion to Deny Plaintiffs' Petition for Attorney Fees and Costs [Docket No. 25], Defendant's Motion to Strike and Exclude Supplemental Evidence [Docket No. 37], and Plaintiffs' Motion to Supplement the Administrative Record [Docket No. 42]. The Court heard oral argument on September 25, 2015. After a thorough review of the record, the Court grants

Defendant's motion for judgment. Plaintiff did not file an appeal of the Administrative Law Judge's decision, so Plaintiff has given up the right to challenge the Administrative Law Judge's findings that were in favor of Defendant. As to Defendant's partial appeal, the Court concludes that Defendant did not violate the law when it suspended Plaintiff during his ninth grade year.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Plaintiff EK

Plaintiff EK is a 16-year-old, African-American male student enrolled in Defendant Minneapolis Public Schools, Special School District No. 1 ("District"). (Ex. 1 at 1.) EK is eligible for special education under the categories of Autism Spectrum Disorder ("ASD") and Emotional Behavioral Disorder ("EBD"). (Ex. 29 at 1.) His Individualized Education Program ("IEP") calls for the District to place him in a federal setting IV school, which is a separate, public day school. (Ex. 29.) EK has received special education services since preschool. (Ex. 114 at 1-2.)

#### 2.    2005 Evaluation

In the fall of 2005, EK was in first grade at Bancroft Elementary School in the District. (Ex. 117 at 1.) At that time, EK was evaluated by Hennepin County

Medical Center ("HCMC") and was found to not meet the criteria for Attention

Deficit Hyperactivity Disorder ("ADHD") or Pervasive Development Disorder

("PDD").  (Ex. 117 at 7.)  His cognitive testing set him at the extremely low to

borderline range, and he was diagnosed with borderline intellectual functioning,

a rule-out diagnosis of mild mental retardation, and Oppositional Defiant

Disorder ("ODD").  (Ex. 117 at 7-8.)

### 3.    2008 Evaluation

In April 2008, Park Nicollet Clinic evaluated EK and diagnosed him with

PDD and ASD.  (Ex. 114 at 2.)  EK's mother ("Mother") requested that the District

conduct a reevaluation of EK's special education needs to determine whether he

met the educational criteria for ASD.  (Ex. 27 at 123.)  After a November 2008

evaluation, the District determined that EK qualified for services under ASD.

(Id.) EK began attending the District-wide autism program at Jefferson

Elementary in January 2009 and remained there until the end of fifth grade.  (Id.)

He then transitioned to middle school in the autism program at Andersen United

Community School.  (Id.)

### 4. 2011-12, Seventh Grade, and 2011 Evaluation

On October 14, 2011, at the beginning of EK's seventh grade year at
Andersen, the District completed a comprehensive reevaluation, as required
every three years under federal law. (Ex. 114.) EK scored in the low average to
very low range compared to same age peers on academic achievement tests. (Id.
at 3.) The evaluation also stated that he had a history of difficult behaviors in
school such as refusing adult direction; bullying, teasing and hitting peers;
hitting and shoving special education staff; and not staying in his seat or the area
of school that he is supposed to be in. (Id. at 7.) The evaluation included a
functional behavior assessment. (Id. at 7-9.) As a result of this assessment, the
District recommended that EK use the positive skills of self-talk and learning to
respectfully make complaints. (Id. at 7.) The evaluation concluded that EK
continued to need special education services based on diagnoses of ASD and
EBD. (Id. at 15.)

In October 2011, the IEP team wrote that EK's "behaviors in the ASD
program, are interfering with his learning & peers. ASD approach is not
successful for [EK]. . . . His mother beli[e]ves [EK] is improperly placed and
request[s] a placement change. . . . His peers are not feeling safe around [EK]."
(Ex. 223.) The SPAN program was recommended. (Id.) EK was unable to

maintain his behavior in a mainstream classroom.  (Ex. 224.)  He was quick to become angry with staff and peers and would "bully peers, especially the vulnerable ones."  (Id.)  The IEP provided for 360 minutes (6 hours) per day of "behavior management" services.  (Ex. 218 at 5.)  The IEP provided that EK would "participate in a highly-structured, behaviorally leveled program which utilizes a token economy to promote positive school behaviors;" receive a small staff to student ratio with staff using frequent and immediate praise, clear and concise directs, limited choices, and disengagement when he attempted verbal power struggles; and have the opportunity to participate in mainstream classes once behavior, attendance, and academic expectations were met.  (Id. at 4.)

Beginning in October of 2011, EK was placed in the seventh grade in a middle school SPAN classroom at Sanford.  (Ex. 1; Ex. 8; Ex. 9; Ex. 27 at 123.) SPAN is a federal setting III special education program.  (Hearing Transcript ("Tr.") at 573; Ex. 27 at 123.)  A SPAN classroom is a special education classroom in a general education building for students with significant emotional and behavioral needs.  (Tr. 573; Ex. 27 at 123.)

### 5. Eighth Grade

During EK's eighth grade year, 2012-13, he attended the SPAN program at the District's Anderson School. (Tr. 573.) His eighth grade IEP identified his primary disability as ASD and his secondary disability as EBD. (Ex. 13 at 1.) The IEP included the Common Core Standards and the Minnesota Comprehensive Assessments. (Id. at 3-6.) EK did not meet the standards in reading, math, or writing, and goals in these areas were identified. (Id. at 3-7.)

EK's IEP team, including Mother, met on October 10, 2012. (Ex. 13.) EK's school record for the year thus far showed that he had used inappropriate speech, including threatening staff and harassing peers; struggled to complete his work; gave up easily; and did not always want to try academic work. (Id.) The IEP team determined that a setting III placement continued to be appropriate. (Id. at 14; Tr. 574.) EK was speaking appropriately at school 76% of the time; acting appropriately 89% of the time; and engaging in learning 71% of the time. (Ex. 13 at 9.) Due to EK's struggles, the District changed his classroom from a mixed seventh and eighth grade group to a group of all eighth grade students. (Id. at 9.) After the change, EK had more success. (Id.) Mother agreed that the change in classroom was a positive move. (Id.; Ex. 14 at 2.)

During the first half of EK's eighth grade year, his teachers stated that he was a "good speller (6th/7th grade level) . . . good at fractions, can multiply/divide, struggles with negative and positive integers, equations (algebra)." (Ex. 12.)

According to a December 3, 2012 Progress Report, EK was reading 110 words per minute, "a small gain." (Ex. 15 at 1.) He increased his vocabulary, use of capitalization, and use of context in reading. (Id. at 1-2.) However, he "had explosive anger moments involving throwing chairs at peers" and "had problems with boundaries around adults also." (Id. at 2.) He decreased his percentage of time speaking, acting appropriately and learning. (Id.)

### 6.    LifeSpan Day Treatment Program

In December 2012, Mother removed EK from eighth grade in the District and placed him at LifeSpan Day Treatment Program, a private day treatment program. (Tr. 409, 539.) LifeSpan discharged EK after a few weeks because he engaged in a physical fight with another student. (Ex. 17 at 69, 71; Tr. 353-54.)

On January 24, 2013, after EK was discharged from LifeSpan, his IEP team met and discussed increasing his special education services to a full-day program in a separate school – a setting IV program. (Ex. 17 at 71.) The IEP team agreed

to return EK to Anderson SPAN and conduct a new functional behavior assessment to see if a transfer to a setting IV program would be appropriate.  (Ex. 17 at 69; Ex. 22 at 82; Ex. 24 at 87; Tr. 574.)

### 7.    April 8, 2013 Functional Behavior Assessment

The new functional behavior assessment was completed on April 8, 2013. (Ex. 27.)  The updated functional behavior assessment stated that, during the first quarter of eighth grade, EK spoke appropriately 75% of the day; acted appropriately 90% of the day; was in place 89% of the day; and engaged in learning 82% of the day.  (Id. at 125.)  From November 5, 2012 to December 3, 2012, he spoke appropriately 74% of the day; acted appropriately 85% of the day; was in place 85% of the day; and engaged in learning 66% of the day.  (Id.)  After EK returned to Anderson SPAN after LifeSpan, from January 25, 2013, to March 22, 2013, he spoke appropriately 74% of the day; acted appropriately 82% of the day; remained in place 82% of the day; and was engaged in learning 62% of the day.  (Id.)

During the first 4 months of the eighth grade year, EK had 47 major behavioral incidents.  (Ex. 27 at 125.)  After returning from LifeSpan he had 26 major behavioral incidents, including 7 physically aggressive behaviors directed

towards peers.  (Id.)  He exhibited talking out and noise related behaviors 30 to 60 times per hour.  (Ex. 27 at 129.)  For the eighth grade year, EK was suspended for 9.03 days.  (Id. at 125.)  He was suspended for actions such as slapping another student in the face, repeatedly pushing staff after making harassing comments, throwing chairs at students, and severe provoking comments and harassment followed by physical aggression or threats of physical violence toward students or staff.  (Id.)

The IEP team, including Mother, reviewed the functional behavior assessment results and decided that EK needed more support than was available in his current setting to be successful in school.  (Ex. 27 at 130.)  Based on the April 9, 2013 IEP team meeting, the IEP team drafted an IEP for a setting IV program and a new behavior intervention plan that was provided to Mother.  (Ex. 29; Ex. 31; Tr. 436.)  Mother advocated for the move to a setting IV program, and she gave written permission to the District to move EK to a setting IV program at the District's River Bend Education Center middle school for the remainder of the eighth grade year.  (Ex. 30 at 151; Ex. 31 at 152; Tr. 348.)

### 8.    River Bend

EK began attending River Bend on April 10, 2013.  (Ex. 31.)  During his time at River Bend, he did well with a point system that used earning points to "buy" items at the school store or earning time on the computer, made academic progress, and had no major behavioral incidents.  (Tr. 447, 575, 597.)  EK increased reading fluency to 127 words per minute at the end of eighth grade; however, he generally refused to participate in math class.  (Ex. 34 at 158.)  He was verbally appropriate 90% of the day and physically appropriate 97% of the day.  (Id. at 160.)  However, EK did have an incident in which he threw a desk, and he would often walk out of class or refuse to do work.  (Id.)

### 9.    May 2013 Evaluation

In May 2013, Mother brought EK to HCMC for a neuropsychological evaluation conducted by Kristen Wiik, Ph.D., L.P.  (Ex. 270, 2013 Wiik Report.)  The report was completed on May 31, 2013.  (Id. at 1.)  Wiik found that EK had an IQ of 61, mood disorder, oppositional defiant disorder, mild intellectual disability, and ASD by history.  (Id. at 6, 9.)  Wiik opined that EK's "recent placement in a self-contained Federal Level IV setting may be beneficial in

providing more individual attention and supports for behavior management."
(Id. at 6.)

Wiik recommended that EK be provided with social skills instruction with supervised interaction with peers, close monitoring to complete tasks, short one-step directions to ensure he understands before moving to the next step, practice techniques in brief intervals over several days to ensure retention, a structured environment for work completion within limited time period and short breaks, simple consistent explicit behavior rules with rewards and consequences, and frequent praise for positive behavior.  (Ex. 270 at 7.)

Wiik later testified that, given EK's level of needs, it was challenging to program educationally for him.  (Tr. 517.)  Traditional social skills teaching might be difficult for him given his cognitive limitations and social skills instruction would need to be tailored to his level of intellectual functioning.  (Id. 520.)  EK's standard scores on academic tests were above what one would expect given his IQ of 61.  (Id. 540.)

### 10.    August 2013 IEP Team Meeting

EK's IEP team met in August 2013 to discuss EK's upcoming attendance at Harrison Education Center.  (Ex. 36.)

## 11. 2013-14, Ninth Grade at Harrison

EK attended ninth grade at Harrison, a setting IV special education high school in the District. (Tr. 87, 575.) According to Dr. Kimberly Adams, then special education administrator/principal at Harrison, all of Wiik's May 2013 recommendations were in place for EK at Harrison. (Id. 120.)

### a) Harrison's Program

Harrison staff use the SAIL Data Collection System. SAIL stands for Speak appropriately, Act appropriately, be In place, and Learn. (Tr. 855-56.) The SAIL approach to data collection allows staff to collect information about students' behaviors. (Id. 855.)

Harrison uses a "point and level system" of behavior management with well-defined behavioral expectations. Students gain independence as they increase appropriate behaviors. (Tr. 861-62, 869.) Social skills instruction is embedded throughout the school day because research shows that it is more effective than when it is taught in isolation. (Id. 870-71.)

Harrison also provides mental health support in the form of a safe, predictable classroom, psychologists and counselors on staff, special education teachers and assistants to support students, mental health providers on site for

families to connect with, and the ability to access psychiatrists from Fairview-University Hospital if families choose to do so.  (Tr. 55-56, 877-78.)

Harrison has adopted the District's curriculum for general education students.  (Tr. 852.)  It also has work experience available to students, such as at the campus coffee shop.  (Id. 877.)  Most of the teachers have licensure in the subject that they teach.  (Id. 864.)

### b)   EK's Ninth Grade Year at Harrison

EK began ninth grade in regular high school classrooms at Harrison.  (Tr. 575-76.)  He had a number of behavioral issues and suspensions.  On September 24, 2013, EK was suspended for the afternoon of that day plus 1 whole day for insubordination/disruptive behavior when he entered a cleared room where a disruptive student was vandalizing the room, and EK remained in the room for one hour egging the other student on and using the classroom phone to make various calls, including impersonating an administrator.  (Ex. 296 at 497.)  On September 26, 2013, EK returned to school and was, that day, suspended for threat/intimidation for the afternoon of that day plus 1 whole day when he walked out of class, threw his lunch on the wall and chairs, threw water on a student, and threatened to kill a teacher.  (Id. at 498.)  On October 9, 2013, EK was

suspended 1 day for disruptive/disorderly behavior for egging other students on, kicking a student, and throwing objects at the student. (Id. at 499.) On November 25, he was suspended for the remainder of the day starting in the morning and 1 more day for fighting. (Ex. 296 at 500.) During this incident, EK was chased by a student and backed into a corner, at which point EK picked up a chair and jabbed it into her face making contact; the two exchanged punches; and then EK got the student in a headlock and hit her twice in the face. (Id.) On December 9, EK was suspended for 1 day for insubordination/disruptive behavior for making harassing statements throughout the day after several interventions (e.g., "fat bitch," "I should beat the shit out of you" "I really want to smack the shit out of you and see what you do"), throwing food at a peer, and throwing pencils. (Id. at 501.) On December 11, he returned to school and was suspended for 1 day for disruptive/disorderly/insubordination for making harassing and threatening comments to staff, pushing staff, and opening a locked door for an angry student to trash the classroom. (Id. at 502.) On December 19, EK was suspended for 1 day for threat/intimidation for threatening to slap a staff member, to beat a staff member, and to throw a computer. (Id. at 503.)

Due to EK's behavioral issues, before winter break, the District moved EK to Kristin Spitzner and Norris Anderson's classrooms. (Tr. 83-84.) Unlike the typical high school schedule used in other Harrison classrooms, students in Spitzner and Anderson's classes switched classes only between the two rooms and had at least three classroom assistants rather than two. (Tr. 72, 81-82, 576, 595.) EK's classroom had one licensed teacher and 3 to 4 special education paraprofessionals. (Id. 81.) The classrooms were designed for students with lower cognitive functioning. (Id. 72.) Some of the students, like EK, had ASD or ASD-like behaviors and needs. (Id.) The classrooms used fewer transitions and an adapted curriculum for the students' lower cognitive abilities. (Id. 72, 89.)

On January 14, 2014, EK was suspended for 1 day for vandalism when he tried to take a teacher's telephone, threw a book, pushed a teacher's coffee mug off of the table, and then later flipped tables and chairs in class. (Ex. 296 at 504.) On February 4, he was suspended for 2 days for theft when he took a teacher's telephone, refused to empty his pockets, threatened staff, and finally handed over the telephone after it rang in his pocket. (Id. at 505; Ex. 8; Ex. 64.) On February 7, EK was suspended for a partial day for disruptive/disorderly behavior for participating in a food fight, started by another student, and

continuing his behavior when staff tried to intervene.  (Ex. 296 at 506.)  On

February 10, he was suspended part of a day for disruptive/disorderly behavior

and insubordination for opening a locked door to allow an upset student in to

attack another student, although directed not to by staff several times, and the

student then assaulted another student in the room.  (Ex. 8 at 34; Ex. 296 at 507.)

(At Harrison, the classroom doors are locked from the outside – no one can get

into the classroom, but not from the inside – students can open the doors from

inside the classroom to leave.  (Tr. 156-57.))  On February 12, EK was suspended

for 1 day for insubordination/disruptive or disorderly behavior when he

threatened other students, then threw tables and chairs, and yelled at a student,

threatening him and calling him a "Down syndrome bitch."  (Ex. 8 at 35; Ex. 296

at 508.)

### 12.    PrairieCare

Due to EK's suspensions and "aggressive behavior," Mother placed EK in

a partial hospitalization program at PrairieCare from February 25, 2014, to March

12, 2014.  (Tr. 408-09; Ex. 282.)  The program expelled EK because of "his

tendency to become intensely disruptive and unwilling to deescalate or

participate in redirected activities;" according to EK's case manager, Angela

Davis, EK was discharged because he "was becoming physically aggressive with staff, and posturing and making threats, creating an unsafe environment over at Prairie Care." (Ex. 282 at 466; Tr. 579.) While at PrairieCare, EK had difficulty with similar-aged peers, so he was moved to a group with younger peers. (Ex. 282 at 466.) According to PrairieCare's discharge notes, in the younger group, "he found it easier to fit into that group, Patient started using self-breaks appropriately, and he left group activities less often, however, he intermittently showed a tendency to become outwardly defiant, vulgar and threatening to staff and peers when his demands were not immediately accommodated." (Id.) A letter from PrairieCare to the District stated that "[s]taff noticed significant improvement in aggressive behaviors when he was programmed with a younger peer group. Pt still struggled but was able to accept staff direction and began to use calming skills well. [EK] continued to struggle with groups that involved more abstract participation and would escalate off task and angry behaviors during this time." (Ex. 283.)

PrairieCare's discharge report noted that EK "was very easily influenced by his peers/environment, and staff concluded that patient would be better served in an educational setting that fits his cognitive and emotional/behavioral

needs." (Ex. 282 at 466.) PrairieCare recommended to the District that EK "not return to EBD programming at Harrison but to have him receive homebound [education] services until a more appropriate education environment can be coordinated." (Ex. 283.) It opined that EK "mimics behaviors he watches in peers and as a result EBD settings without the strong focus on his cognitive abilities only serves to introduce E[K] to escalated behaviors." (Id.)

On March 17, 2014, Mother wrote to the District stating that she was concerned about EK's education because of the number of suspensions and other issues. (Ex. 292.) She requested that the District transfer him to District 287. (Id.) The District denied her request, stating that Harrison was the appropriate placement. (Ex. 86.) There was also information that District 287 was not accepting students from the District. (Ex. 284 at 472.)

### 13. EK's Return to Harrison in April 2014

EK returned to Harrison on approximately April 9, 2014. (Ex. 1 at 2.) He had no out-of-school suspensions from April 9, 2014 until the end of the school year. (Tr. 827-28; Ex. 6.) Harrison school psychologist Jesse Kurtz became the point person for EK, and the class composition was altered in EK's class. (Id. 768-69.) Kurtz testified that EK made improvements in socialization, such as

mediating conflicts with other students, making more friends, and remaining at school after a conflict rather than deciding to go home.  (Id. 650-51.)  Anderson testified that EK met and exceeded his reading fluency goals and was one of the most willing students to read aloud in class and enjoyed that role.  (Id. 769-70.)  During the fourth quarter of 2014, EK met all SAIL criteria, except for the on-task portion, which was at 80%.  (Id. 773-74.)

### 14.    Wiik April 2014 Correspondence

On April 14, 2014, at the request of EK's case manager, who indicated that placement at Harrison was not going well, Wiik and her colleague, psychiatrist Dr. Caromyr Figueroa, sent the District a letter.  (Ex. 289; Tr. 524-26.)  The letter explained EK's cognitive impairments and stated that adults might be overestimating his level of functioning and judgment.  (Ex. 289.)  The letter opined that EK "is a vulnerable patient, and in my professional opinion, the EBD programming at Harrison may not be a suitable fit.  I feel it is imperative for his growth and development to be placed in a more suitable educational setting that will address his low cognitive functioning."  (Id.)

Wiik later testified that if EK were given academic tasks that were too challenging, he would likely become "frustrated and might become aggressive."

(Tr. 513-14.)   She explained that it would be important for her to know EK's functional academic skills in order to successfully intervene on his behalf; she would need input from his teachers and also new academic assessments or screenings.  (Id. 530-31.)  She recommended a positive reinforcement program that provided immediate reinforcement, rather than a system in which he accumulated points over a week.  (Id. 519.)  She also recommended academic programming at his level of ability, behavior interventions at a level he could understand, mental health assistance, and an environment free of peers who would lead him into more disruptive behavior.  (Id. 517.)

### 15.    Administrative Hearing

On May 5, 2014, Mother filed a Verified Complaint and Request for an Administrative Hearing with the Minnesota Department of Education under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, et seq. ("IDEA"). The Verified Complaint also alleged race discrimination under Title VI of the Civil Rights Act of 1964 and disability discrimination under the Rehabilitation Act and the Americans with Disabilities Act; however, it simultaneously requested that the claims that could not be adjudicated within an IDEA administrative hearing be dismissed without prejudice.  Mother claimed that the

District had denied EK a free appropriate public education ("FAPE") and sought

compensatory education, an independent educational evaluation, and a change

in the location of EK's education services.  The disability and race discrimination

claims were dismissed without prejudice by the ALJ because the ALJ only had

authority to hear IDEA claims.  (Second Pre-hearing Order at 3 ¶¶ 9-10 (June 16,

2014).)

The administrative law judge ("ALJ"), Steve. M. Mihalchick, defined the

issues before him as follows:

1.     Whether the School District provided Student a Free
       Appropriate Public Education (FAPE) since May 5, 2012.  In
       particular:

       a.     Was the October 2011 evaluation of Student sufficiently
              comprehensive to identify all of the Student's special
              education and related service needs?

       b.     Was the use of "SAIL" data system criteria and
              measurements to set and measure IEP achievement
              goals and progress appropriate?

       c.     Was Student's IEP team required to include a qualified
              ASD teacher?

       d.     Was there a failure to communicate and cooperate with
              Student's mother and her advisors that denied
              Student's mother's right to participate in the Student's
              education?

2. Whether Student's mother forfeited the right to an Independent Educational Evaluation (IEE)?

3. Whether the School District unilaterally changed Student's placement through a pattern of suspensions and exclusions that totaled more than ten school days in one school year. If so, did it cause Student a loss of educational benefit entitling him to compensatory education?

([Docket No. 1-2] ALJ Findings of Fact, Conclusions of Law and Order (Sept. 12, 2014) ("ALJ Decision") at 1-2.)

A four-day hearing was held in July 2014. (ALJ Decision at 3 ¶ 8.) Mother called seven witnesses: Adams, Jennifer Littlewolf, LaMadrid Wilson, Nicholas Puchalski, Mother, Angela Davis, and Wiik. (Id. at 3-4 ¶ 9.) The District also called three additional witnesses: Kurtz, Anderson, and Dr. Don Allen. (Id.)

The ALJ issued his decision on September 12, 2014. (ALJ Decision at 20.) In the ALJ's conclusions of law, he found that 1) the 2011 evaluation was sufficiently comprehensive; 2) the use of the SAIL data system was appropriate; 3) Minnesota law required that the IEP team contain a professional with expertise in ASD; the law does not require an ASD teacher; and the District's use of the school psychologist as the ASD expert on the IEP team complied with the law; 4) Mother was not denied the right to participate meaningfully in EK's education; 5) the District had provided EK a FAPE at all relevant periods, except

for the times that Mother placed EK at non-District day treatment providers; 6)

Mother was not entitled to an independent education evaluation at this time; and

7) EK was entitled to compensatory education because the District changed his

placement through a pattern of suspensions totaling more than 10 days in one

school year.  (Id. at 18-19.)

> As a remedy, the ALJ ordered:
>
> As compensatory education, the School District should be ordered to retain Dr. Kristen Wiik to assist the IEP team in evaluating Student and designing and amending Student's IEP throughout the 2014 – 2015 school year.  Dr. Wiik should be allowed to conduct any further evaluation of Student that she believes may be helpful to those duties.

(Id. at 19 ¶ 10.)

## B.    Procedural History

On October 14, 2014, 32 days after the ALJ Decision, EK filed a Petition and

Memorandum in Support of Petition for Attorney's Fees and Costs against the

District in this Court.  [Docket No. 1]   In the Petition, EK characterizes the

current action before this Court as follows: "This is an action for payment of

attorney's fees and costs associated with a special education administrative

hearing initiated on E.K's [] behalf."  (Id. at 1.)  EK asserts that he was the

prevailing party at the administrative level and seeks an award of attorney's fees

and costs of $56,886.00 for the amount spent on the underlying administrative hearing.  (Id. at 10, 12.)  EK does not appeal the ALJ decision; assert that any of the ALJ's conclusions or findings were wrong; or argue that this Court should come to a different outcome than the ALJ.

On November 5, 2014, 54 days after the ALJ Decision, the District filed its Answer to Plaintiff's Petition for Attorneys' Fees and Appeal in Part of Administrative Decision.  [Docket No. 6]  In its Counterclaim, the District appealed the portion of the ALJ Decision that awarded compensatory education in the form of including a specific psychologist to consult with EK's IEP team for one year.  (Id. at 7 ¶ 3.)  The District asserted that the ALJ's findings, including that the District had provided EK with a FAPE, did not support the award of compensatory education; and that the ALJ made an error of law when he determined that suspension of more than 10 days in a school year creates an automatic finding that the student was denied a FAPE and suffered educational harm.  (Id. at 7.)

The District has now filed a motion for summary judgment.  After EK filed his opposition brief and attached additional documents that were not part of the

administrative record, the District filed a motion to strike.  EK then filed a motion

to supplement the record.

## III.    DISCUSSION

### A.    Standard of Review under the IDEA

The IDEA seeks to ensure that all disabled children receive a free
appropriate public education (FAPE) designed to meet their needs.
To that end, the IDEA provides federal money to state and local
education agencies in order to assist them in educating handicapped
children on the condition that the states and local agencies
implement the substantive and procedural requirements of the Act.
Substantively, for example, school districts must develop an IEP for
each disabled student.

C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347, 591 F.3d 624, 630 (8th Cir.

2010) (citations omitted).  The IEP must be "reasonably calculated to enable the

child to receive educational benefits."  C.B. v. Special Sch. Dist. No. 1, 636 F.3d

981, 989 (8th Cir. 2011) (citation omitted).

Under the IDEA, a parent or school district is entitled to an administrative

hearing challenging a student's IEP or any aspect of a student's special

education.  C.N., 591 F.3d at 630.  After exhausting administrative remedies, an

aggrieved party may seek judicial review in state or federal court.  20 U.S.C. §

1415(i)(2)(A); Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 560 (8th Cir. 1996).

"The party bringing the action shall have 90 days from the date of the decision of

the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows." 20 U.S.C § 1415 (i)(2)(B).

> In deciding whether the IDEA has been violated, the district court must independently determine whether the child [in question] has received a FAPE. In doing so, the court must also give due weight to agency decision-making. This somewhat unusual standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law. But we have recognized that this limited grant of deference—due weight—is appropriate in IDEA cases because the ALJ had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s].

K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 803 (8th Cir. 2011) (citations omitted).

### B.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case." <u>Amini v. City of Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### C.  Whether EK Filed a Timely IDEA Appeal

In response to the District's motion for summary judgment, EK argues that the ALJ erred with regard to whether the District provided a FAPE, whether Harrison was an appropriate placement, whether the District correctly evaluated EK, and other issues.  However, EK has never attempted to appeal the ALJ Decision.  EK's Petition in this case merely requests attorney's fees based on the award of compensatory education by the ALJ.  It does not state, explicitly or otherwise, that the ALJ erred.

EK was required to appeal within 90 days after receiving the ALJ Decision. <u>See</u> 20 U.S.C. § 1415(i)(2)(B); Minn. Stat. § 125A.091, subd. 24.  If a party fails to file a civil complaint within 90 days of receiving the ALJ's decision, the IDEA claims are "time-barred."  <u>Brittany O v. Bentonville Sch. Dist.</u>, No. 4:14CV00135 JLH, 2015 WL 284971, at *4 (E.D. Ark. Jan. 22, 2015).  When a student does not file a federal complaint within 90 days, but, instead, files a counterclaim to the school district's timely complaint more than 90 days after the administrative decision,

the student's counterclaim must be dismissed.  See Northport Pub. Sch. v.

Woods, No. 1:11-CV-982, 2013 WL 435962, at *4 (W.D. Mich. Feb. 4, 2013).

Here, the ALJ Decision was issued on September 12, 2014.  A civil action

seeking review would have been due on December 11, 2014.  EK did not appeal

the ALJ Decision, but, instead, filed a civil action seeking attorney's fees and

costs.  [Docket No. 1]  EK's Petition is clear that he only seeks an award of

attorney's fees and does not dispute any of the ALJ's findings or conclusions.  On

November 5, 2014, the District filed an Answer and a timely partial appeal of the

ALJ Decision.  [Docket No. 6]  EK did not file a cross appeal, although there was

still more than one month left before the 90-day limitations period expired.

Finally, EK provides no argument in favor of extending the deadline to

appeal.  No equitable argument could be made when 1) EK, himself, initiated

this action as a petition for attorney's fees; and 2) the District filed an appeal on

November 5, 2014, alerting EK to the District's intent to appeal when more than

one month still remained for EK to file a cross appeal.

EK's claims that the ALJ erred are not properly before the Court because

EK did not appeal the ALJ's decision, choosing instead to seek attorney's fees for

the one portion of the ALJ Decision that favored EK, and the time to appeal has

long since expired.  Thus, the Court will not address EK's arguments seeking to reverse the ALJ's conclusions.  The only portion of the ALJ Decision properly before the Court is the District's appeal of the ALJ's decision that the District violated the IDEA with regard to its suspensions of EK during his ninth grade year and of the ALJ's award of compensatory education.

### D.     EK's Arguments Regarding Current Placement and the New Evaluation

EK also attempts to challenge his current placement at Harrison and the new evaluation.  However, EK has not exhausted administrative remedies with regard to these actions.  EK has not offered any argument that exhaustion is not required.  Therefore, the appropriateness of the current evaluation, IEP, and placement at Harrison are not before the Court.

"IDEA does not 'restrict or limit the rights, procedures, and remedies available' under other federal law, but it does require a claimant to exhaust administrative remedies."  Indep. Sch. Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 562 (8th Cir. 1996) (quoting 20 U.S.C. § 1415(f)).  See also Barclift v. Westonka Indep. Sch. Dist. 277, No. CIV. 14-0466 (MJD/HB), 2015 WL 321415, at *3 (D. Minn. Jan. 26, 2015) ("One must exhaust the state administrative remedies before seeking relief in federal court.").  "Courts recognize only three exceptions to the

exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is contrary to law." J.B. ex rel. Bailey v. Avilla R-XIII Sch. Dist., 721 F.3d 588, 594 (8th Cir. 2013) (citation omitted).

EK's reevaluation was due shortly after the administrative hearing. (ALJ Decision at 19 ¶ 8.) After the reevaluation, the IDEA requires that the IEP team review the evaluation and make necessary changes to the IEP. Mother has the right to object to the reevaluation or its results. The ALJ explicitly advised Mother of her right to request an independent educational evaluation after the new evaluation was completed. (ALJ Decision at 19 ¶ 8.) Mother also has the right to file a complaint with the Department of Education or ask for a hearing. Minn. Stat. § 125A.091, subd. 12. However, although represented by counsel, Mother did none of these things, so there is no administrative record regarding the new evaluation or IEP.

EK failed to exhaust administrative remedies and he has not argued that any of the exceptions to the exhaustion requirement apply. Therefore, the competency of that evaluation and the programming that flowed out of it is not

the subject of this Court case, and those issues have not been administratively exhausted.

**E.      Motion to Strike and Motion to Supplement**

**1.      Exhibits at Issue**

The District has filed a motion to strike five documents submitted by EK that are outside the administrative record, and EK has filed a motion to supplement to include the same five documents:

Supplemental Ex. 1, Curriculum Vitae, Kristen L. Wiik, Ph.D., L.P.

Supplemental Ex. 2, Wiik Evaluation Report, December 15, 2014

Supplemental Ex. 3, Wiik correspondence dated January 23, 2015

Supplemental Ex. 4, MPS Executive Summary, District Management Council - June 2014

Supplemental Ex. 5, University of Saint Thomas, Community Justice Project, Complaint against Minneapolis to the United States Department of Justice, Civil Rights Division, Education Opportunities Section, March 15, 2015

EK attempted to admit Wiik's CV at the administrative hearing, but the ALJ rejected the CV because it had not been timely provided to the District before the hearing.  (Tr. 492.)  However, Wiik testified as to her credentials.  (Id. 493-96.)  Supplemental Exhibit 2 is the evaluation that Wiik completed in connection with the remedy ordered in the ALJ Decision.  Exhibit 3 is a letter

from Wiik to the District from January 2015 providing Wiik's recommendations regarding programming for EK. Supplemental Exhibit 4 is the Executive Summary from a Special Education Opportunities Review of the Minneapolis Public Schools, conducted by independent consultant District Management Council. The District hired District Management Council to conduct the analysis, and it was completed in June 2014. The Executive Summary provided does not mention Harrison, but rather, makes broad statements and suggestions regarding the District's programming for students receiving special education services as a whole. Finally, Supplemental Exhibit 5 is a March 2015 Complaint written by the University of St. Thomas School of Law Community Justice Project ("OCR Complaint"). The OCR Complaint states that it will be submitted to the U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section, but there is no indication if the OCR Complaint was actually filed. The OCR Complaint is based on allegations by a former Harrison student, J.G., regarding Harrison and his educational experience in the District.

## 2. Standard for Admission of Additional Evidence

In considering an appeal of an administrative decision under the IDEA, the Court "(i) shall receive the records of the administrative proceedings; (ii) shall

hear additional evidence at the request of a party; and (iii) basing its decision on

the preponderance of the evidence, shall grant such relief as the court determines

is appropriate."  20 U.S.C. § 1415(i)(2)(C).

> Although the statute permits the reviewing court to expand
> the administrative record, [d]ecision on the record compiled before
> the administrative agency is the norm . . . so a party that wants the
> judge to take evidence rather than decide the case on the record
> compiled before the hearing officers had better tell him.  Because the
> reviewing court must give due weight to the administrative
> proceedings, a party seeking to introduce additional evidence at the
> district court level must provide some solid justification for doing
> so.

Indep. Sch. Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 560 (8th Cir. 1996) (citations

omitted).  "Judicial review of agency action may be conducted on the

administrative record even if there are disputed issues of material fact."  Id. at

561.  "The district court must give 'due weight' because the administrative panel

had an opportunity to observe the demeanor of the witnesses and because the

court should not substitute its own educational policy for those of the school

authorities that they review."   Sch. Bd. of Indep. Sch. Dist. No. 11 . Renollett, 440

F.3d 1007, 1010-11 (8th Cir. 2006) (citation omitted).

### 3. Relevance of the Requested Evidence in Light of EK's Failure to Appeal the ALJ Decision

EK has not provided a solid justification for supplementing the administrative hearing record. The administrative record is comprehensive and detailed, and, with the exception of the CV, the proposed supplemental evidence relates to events that occurred after the administrative hearing. In these circumstances, supplementation is not needed. See W. Platte R-II Sch. Dist. v. Wilson, 439 F.3d 782, 785 (8th Cir. 2006). Moreover, the ALJ held that EK had received a sufficient evaluation and a FAPE and denied EK's request for an independent educational evaluation. EK did not appeal the ALJ's decision. The only issue before the Court is whether the ALJ erred in ordering compensatory education. None of the proposed evidence is relevant to that narrow issue. Rather, the evidence that EK seeks to offer would only be relevant with regard to 1) barred claims regarding whether he received a FAPE, proper evaluation, and proper placement; or 2) claims regarding the last year of education, which have not been exhausted administratively.

Additionally, even if the barred claims were before the Court, the Executive Summary is not relevant because it makes no mention of Harrison and, separated from the underlying report itself, is vague and unhelpful. The OCR

Complaint is not admissible evidence.  It simply contains allegations by a different unidentified student, and there is no evidence regarding whether the OCR Complaint was actually filed with the Department of Justice or not.

Thus, Defendant's motion to strike is granted and Plaintiffs' motion to supplement is denied.

**F.**     **Whether the District's Suspension of EK Violated the IDEA**

After a thorough review of the record, the Court concludes that the ALJ erred in concluding that the District's suspensions of EK violated the IDEA and in awarding compensatory education.

**1.**     **Standard for Suspensions under the IDEA**

Generally, under federal and state law, the District may suspend students with disabilities, so long as procedural due process requirements are met.  See Goss v. Lopez, 419 U.S. 565, 576 (1975) (holding that due process applies to suspensions); 20 U.S.C. § 1415(k)(1)(A); Minn. Stat. § 121A.43, Minnesota Pupil Fair Dismissal Act (providing that schools may suspend students with disabilities consistent with federal law and state due process requirements). Under the IDEA three main restrictions limit school's authority to suspend

students with disabilities: length of suspension, procedural requirements, and FAPE.

### a) Length of Suspension

Under the IDEA, a school is limited in the length of suspension given if the student is a child with a disability and the behavior for which suspension is proposed is behavior which is a manifestation of the student's disability. 20 U.S.C. § 1415(k)(1); 34 C.F.R. § 300.530(c). If these both of these conditions apply, the school cannot issue a suspension that runs for more than 10 consecutive school days for a single behavior incident. 20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(b).

### b) Procedural Requirements

The IDEA provides that school officials can issue a series of short suspensions in response to separate behavior incidents by the same child, even if the total of the suspensions results in a "change of placement." See 34 C.F.R. § 300.536. Specifically, the IDEA provides that "[s]chool personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct." 20 U.S.C. § 1415(k)(1)(A). See also 34 C.F.R. § 300.530(a).

Under the IDEA, a change of placement occurs when a series of short suspensions accumulate to more than 10 school days in a school year and a number of other factors are met. <u>See</u> 34 C.F.R. § 300.536(a). Specifically:

(a) For purposes of removals of a child with a disability from the child's current educational placement . . ., a change of placement occurs if—

(1) The removal is for more than 10 consecutive school days; or

(2) The child has been subjected to a series of removals that constitute a pattern—

(i) Because the series of removals total more than 10 school days in a school year;

(ii) Because the child's behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals; and

(iii) Because of such additional factors as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another.

(b)(1) The public agency determines on a case-by-case basis whether a pattern of removals constitutes a change of placement.

(2) This determination is subject to review through due process and judicial proceedings.

34 C.F.R. § 300.536.

When a change of placement occurs, the school must ensure that certain procedures are met.

First, a manifestation determination must be conducted "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct." 20 U.S.C. § 1415(k)(1)(E)(i). <u>See also</u> 20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(e). The manifestation determination is made by "the local educational agency, the parent, and relevant members of the IEP Team." 20 U.S.C. § 1415(k)(1)(E)(i).

If the behavior is not a manifestation of the student's disability, "the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities, except [that the child must be provided educational services.]" 20 U.S.C. § 1415(k)(1)(C).

If the behavior was a manifestation of the child's disability, the IEP team must conduct a functional behavioral assessment and implement a behavior intervention plan for the student. 20 U.S.C. § 1415(k)(1)(F)(i). If the student already had a functional behavioral assessment and has a behavioral intervention plan, the IEP team must "review the behavioral interventional plan"

and "modify it, as necessary, to address the behavior." 20 U.S.C. § 1415(k)(1)(F)(ii). See also 34 C.F.R. § 300.530(f)(1).

After suspension, the student must be returned to the placement from which he was removed, unless the precipitating behavior involved a weapon, drugs, or serious bodily injury or unless the parent and school district agree to a change of placement. 20 U.S.C. §§ 1415(k)(1)(F)(iii), (G); 34 C.F.R. §§ 300.530(f)(2), (g).

### c)    FAPE

If a student suffers a lack of adequate progress in school because of ongoing suspensions, the ALJ may view the facts as a whole and find that the school district has denied the student a FAPE. See 20 U.S.C. § 1412 (a)(1)(A) ("A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.").

### 2.    Whether the District Complied with the IDEA when It Suspended EK

### a)    Length of Each Suspension

EK was not suspended for more than 10 consecutive school days for a single behavior incident.

### b) Procedures for the Suspensions

### a. Whether a Change of Placement Occurred

The District asserts that a change of placement did not occur during EK's ninth grade year because EK's precipitating behaviors were not substantially similar, the removals were not of an unreasonable length, and the removals were not temporally proximate to one another. See 34 C.F.R. § 300.536(a)(2)(ii)-(iii).

Giving due weight to the ALJ, the Court upholds the ALJ's determination that the District's suspensions of EK during his ninth grade year constituted a change of placement. Despite the District's claim, the ALJ did not apply a per se 10-day rule. The ALJ does mention prorated days, but it appears that this comment is simply an explanation of how frequently, in context, the District suspended EK, not a statement of law that the days should be prorated. In total, EK was suspended for more than 10 days.

The ALJ correctly cites the standard for determining a change of placement as set forth in the federal regulations. (ALJ Decision at 23-24.) He then proceeds to analyze each of the relevant factors. (Id.)

The ALJ first analyzes whether there were more than 10 total days of removal. As the Court has noted, there were more than 10 total days.

The ALJ then discusses whether the precipitating behavior was similar. After reviewing the record, the Court agrees that almost all of the precipitating behavior was disruptive, aggressive, and threatening.

The ALJ correctly notes that the suspensions were often close in time. For example, there were four in February 2014. The suspensions were particularly numerous when one considers that EK was frequently absent from school for unexcused absences and other reasons.

The Court agrees with the District that EK's precipitating behavior was often egregious and that the suspensions were for short periods of time.

On the whole, weighing all of the factors and giving due weight to the ALJ's decision, the Court finds that the District did conduct a change of placement of EK.

### b.      Whether the Procedural Requirements Were Met

The Court concludes that the ALJ erred in finding that the District violated the IDEA. Under the IDEA, if suspensions constitute a change of placement, certain procedural requirements must be met, which the District met in this case.

First, the District conducted manifestation determinations at the appropriate times. Specifically, on February 4, 2014, EK stole a staff member's

cell phone and then lied and said that another student had committed the theft. He was suspended for 2 days. This suspension took EK's total suspensions for the year to more than 10 days. On February 7, EK was suspended for the afternoon, and on February 10, he was suspended for another partial day. Kurtz met with EK on February 4. It was determined that a manifestation determination meeting would be held. (Ex. 277.) The manifestation determination took place on February 11, 2012. (Ex. 276; Ex. 277.)

Second, the IEP team reviewed EK's functional behavior assessments from April 8, 2013 and October 14, 2011; reviewed his IEP; and discussed the manner in which alternative education services would be provided to EK if he were suspended again. (Ex. 277.) The team reviewed his behavioral history and discussed the current behaviors that were posing difficulties for EK. (Ex. 277.) The team agreed that the behaviors were a manifestation of EK's disability.

Third, IEP team modified his behavioral intervention plan. The team discussed strategies to employ such as putting clear expectations on the board, using a verbal or physical prompt to remind him like nodding head toward the door; using positive praise as he responded well to it; earning extra time on the computer or iPad; and continuing to work with Kurtz because that was going

well.  (Id. at 452.)  Spitzer, noted that she was in the process of creating a new stand-alone behavior intervention plan for EK.  (Id.)  The IEP team agreed that she should continue to work on a revised behavior intervention program for EK and that a teacher should call home between 9 a.m. and 11 a.m. to help EK complete homework sent home on days that he was suspended.  (Id. at 453.)

The IEP team met again on February 24, 2014, after EK had received a one day suspension for throwing furniture and threatening and harassing another student.  (Ex. 278.)  The team conducted a manifestation determination, discussed changes to the behavior intervention plan, and discussed the "alternative education services" which would be provided to EK when he was suspended.  (Ex. 278; Tr. 125.)  On February 26, the District sent Mother a prior written notice and the revised behavior intervention plan.  (Ex. 279.)  After February 2014, EK had no more out-of-school suspensions for the school year after he returned from PrairieCare, so the modifications appear to have been successful.

Fourth, after each suspension, EK was returned to the placement from which he was removed.

The Court further concludes that the District met the IDEA's requirement that, during a change of placement, the student must "[c]ontinue to receive educational services, as provided in § 300.101(a), so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 C.F.R. § 300.530(d)(1), (5). The District addressed a plan for EK to continue to receive homework and to have a teacher call his house between 9 a.m. and 11 a.m. to assist him with that homework if he faced future suspensions. Thus, the Court finds that the District did meet the IDEA's requirement for continuing educational services.

Even if the District's suspensions of EK constituted a change in placement, the District met all IDEA requirements with respect to that change in placement. The Court concludes that the ALJ's conclusion that the District violated the IDEA was erroneous.

### c) FAPE

The ALJ found that EK made educational progress and was provided a FAPE by the District in both eighth and ninth grade. (ALJ Decision at 17, 23.) Neither party appealed that portion of the ALJ's decision.

**G.      Whether the ALJ Erred in Awarding Compensatory Education**

A plaintiff "is entitled to recover compensatory educational services if she prevails on her claim that the defendants denied her a free appropriate education in violation of the EHA." Miener By & Through Miener v. State of Mo., 800 F.2d 749, 754 (8th Cir. 1986). Conversely, when a student has been provided a FAPE, compensatory education services are not available. See M.M. ex rel. L.R. v. Special Sch. Dist. No. 1, 512 F.3d 455, 461 (8th Cir. 2008) (noting that "[i]t is doubtless true that any child suffers a loss of educational benefit when suspended," but reversing an award of compensatory special education benefits when student had, despite suspensions and transfer, received a FAPE). See also C.W. ex rel. Louise W. v. The Rose Tree Media Sch. Dist., 395 F. App'x 824, 828 (3d Cir. 2010) (holding that student was "not eligible for compensatory education" when "she was not denied an appropriate education," because "[t]he purpose of compensatory education is not to punish school districts for failing to follow the established procedures for providing a free appropriate public education, but to compensate students with disabilities who have not received an appropriate education"); G ex rel. RG v. Fort Bragg Dependent Sch., 343 F.3d 295, 309 (4th Cir. 2003) ("Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed

an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student."); Walker v. D.C., 786 F. Supp. 2d 232, 238 (D.D.C. 2011) ("Denial of a FAPE is a prerequisite to an award of compensatory services.") (citing Reid ex rel. Reid v. D.C., 401 F.3d 516, 518 (D.C. Cir. 2005)). Lack of a FAPE is a prerequisite to an award of compensatory education.

The Court concludes that the ALJ erred when he ordered compensatory education services for EK even though the District did not violate the IDEA and the District provided EK with a FAPE.

The ALJ found that the suspensions had a detrimental effect on EK's education. However, the Eighth Circuit is clear that the detrimental effect on education standard is incorrect and awarding compensatory education based on that bare finding is reversible error. See M.M. ex rel. L.R., 512 F.3d at 461 (noting that "[i]t is doubtless true that any child suffers a loss of educational benefit when suspended," but reversing an award of compensatory special education benefits when student had, despite suspensions and transfer, received a FAPE). Therefore, the ALJ erred in awarding compensatory education based on a

detrimental effect on EK's education combined with a finding that EK did receive

a FAPE.  The Court reverses the award of compensatory education.

### H.    Petition for Attorney Fees

Because the Court has reversed the ALJ's award of compensatory

education services, EK did not succeed on any of his claims.  Thus, EK's request

for attorney fees and costs is denied.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.    Defendant's Motion for Judgment on the Administrative
      Record and Motion to Deny Plaintiffs' Petition for Attorney
      Fees and Costs [Docket No. 25] is **GRANTED** and this matter
      is **DISMISSED WITH PREJUDICE**.

2.    Defendant's Motion to Strike and Exclude Supplemental
      Evidence [Docket No. 37] is **GRANTED**.

3.    Plaintiffs' Motion to Supplement the Administrative Record
      [Docket No. 42] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   December 22, 2015          s/Michael J. Davis
                                    Michael J. Davis
                                    United States District Court